

# NUMBER 13-16-00332-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**MARK A. CANTU III,**                                                         **Appellant,**

**v.**

**COMMISSION FOR LAWYER DISCIPLINE,**                  **Appellee.**

---

## On appeal from the 398th District Court
## of Hidalgo County, Texas

---

# MEMORANDUM OPINION ON REMAND

### Before Justices Benavides, Longoria, and Tijerina
### Memorandum Opinion on Remand by Justice Benavides

Mark A. Cantu III appeals his judgment of disbarment. On original submission to this Court, a divided panel reversed and remanded the case after concluding that the admission of testimony by the federal bankruptcy judge who oversaw Cantu's adversary bankruptcy proceedings constituted error. *See Cantu v. Comm'n for Lawyer Discipline*, 595 S.W.3d 235, 238 (Tex. App.—Corpus Christi–Edinburg 2018), *rev'd*, 587 S.W.3d 779

(Tex. 2019). The Texas Supreme Court reversed the majority's decision, concluding that neither the admission of the judge's testimony nor the admission into evidence of the judge's memorandum opinion constituted reversible error. *Comm'n for Lawyer Discipline v. Cantu*, 587 S.W.3d 779, 780 (Tex. 2019) (per curiam). The supreme court remanded the case to this Court to consider Cantu's remaining issues. *See id.*

In this appeal, we address Cantu's remaining issues pertaining to the admission of expert testimony, charge error, jury deliberations, the legal and factual sufficiency of the evidence, the propriety of sanctions based on actions taken by Cantu in his individual rather than professional capacity, the trial court's findings of fact and conclusions of law, and the award of attorney's fees. We affirm Cantu's judgment of disbarment.

## I. BACKGROUND

The Commission for Lawyer Discipline (Commission) brought a disciplinary action against Cantu alleging that he committed professional misconduct during a bankruptcy proceeding involving Cantu, his wife Roxanne Cantu, and a company that they owned and controlled, Mar-Rox, Inc. (Mar-Rox). In its "First Amended Original Disciplinary Petition," the Commission alleged:

> Respondent Mark A. Cantu, his wife, and a company they controlled, Mar-Rox, Inc., filed voluntary proceedings in bankruptcy [on] May 6, 2008. The bankruptcy was converted to a chapter seven liquidation proceeding and a Trustee [was] appointed to administer the estate [on] June 24, 2009. At the time of the voluntary bankruptcy filing, the Cantus owned University Inn [M]otel, Palm Plaza Motel and RV Park, La Vista Mobile Home Park, and Dominion Apartments. They owned Mar-Rox, Inc., through which they owned The Atrium, an office building in McAllen, four restaurants, and several other commercial properties for real estate holdings valued at about $24 million. The personal property which the Cantus admit[ed] owning in their bankruptcy schedules was valued [at] about $3.9 million. Mr. Cantu owned a successful law practice. At the time of the voluntary bankruptcy filing, the Cantus had more than $37 million in secured debt and more than

2

$10 million in unsecured debt. Their company, Mar-Rox Inc., had more than $20 million in debt.

The bankruptcy schedules and statements of financial affairs made by Cantu under penalties of perjury[] failed to include significant assets and transactions. Respondent failed to disclose Respondent's interests in two contingency fee cases, failed to disclose jewelry sales of more than $100,000.00 and failed to schedule two life-sized bronze horses worth about $20,000.00. The horses were placed on property belonging to Respondent Cantu's sister in an apparent attempt to conceal them.

Respondent Cantu also failed to disclose a transfer of $50,000.00 to a friend, Baldemar Perez. The money was part of a $150,000 settlement as part of a claim in the bankruptcy court. Cantu was not honest with the Court regarding how that money was spent. Respondent failed to provide records of his use of estate funds and failed to provide records of cash withdrawals from the estates, including cash withdrawals from the businesses University Inn and La Vista. This use of cash violated orders of the bankruptcy court regarding the use of cash collateral.

Cantu interfered with the sale of estate assets and failed to turn over assets belonging to the estate. He [interfered] with the sale of the Atrium building, he interfered with the turnover of valuable artwork from his offices, [and] he attempted to hide the horse statues.

Respondent Cantu made material false oaths regarding the existence of water damage cases in which Mar-Rox had an interest, the existence of contingency fee interests, jewelry sales, and the transfer of $50,000.00 to his friend.

Throughout the bankruptcy proceeding, Respondent Cantu disregarded the requirements of the bankruptcy code and demonstrated a pattern of omission, obfuscation and non-compliance in violation of his obligations to the court. This pattern of behavior obstructed the administration of the bankruptcy estate and the [c]ourt, increased the expense and inconvenience for the trustee, the estate and the court and otherwise interfered and complicated the bankruptcy case . . . and its administration.

Thus, in sum, the Commission alleged that Cantu failed to disclose significant assets in his bankruptcy filings, failed to turn over assets belonging to the bankruptcy estate, interfered with the sale of estate assets, made "material false oaths," and "demonstrated a pattern of omission, obfuscation and non-compliance in violation of his obligations to

3

the [bankruptcy] court." The Commission alleged that these actions constituted multiple violations of the Texas Disciplinary Rules of Professional Conduct (Rules). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.02, 3.03(a)(1),(5), 3.04(d), 8.04(a)(1),(3), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A.[1]

By his "First Amended Original Answer," Cantu made a general denial, specifically denied that he violated the Texas Disciplinary Rules of Professional Conduct, and alleged that any alleged violation of Rule 3.04(d) "was based upon his understanding that no valid obligation existed, or that the client was willing to accept any sanctions arising from such disobedience."

After discovery and further proceedings, the Commission's case against Cantu for professional misconduct was submitted to a jury over the span of four days. The Commission presented testimony from: (1) Michael Schmidt (Schmidt), the bankruptcy trustee for Cantu's Chapter 7 bankruptcy proceedings; (2) Judge Marvin Isgur, who presided over the adversarial proceedings in Cantu's bankruptcy, and (3) Cantu. Cantu presented testimony from: (1) Stephen Sather, a bankruptcy expert, (2) Katherine Driscoll Julia, an attorney who represented Cantu in a medical malpractice case and a legal malpractice case against one of Cantu's bankruptcy attorneys; and (3) Bill Piatt, an ethics expert. The parties also submitted various exhibits in support of their cases. The Commission offered into evidence, inter alia, Judge Isgur's memorandum opinion, some of Cantu's bankruptcy filings, and many of the orders issued in the bankruptcy proceedings. Cantu offered Piatt's resume.

---

[1] The Commission's case was originally filed in 2012. The parties have not presented argument or authority that any changes in the Texas Disciplinary Rules of Professional Conduct or the Texas Rules of Disciplinary Procedure are salient to the analysis here, and so we cite to the current rules.

4

After the parties rested and closed, the trial court submitted six questions to the jury regarding whether Cantu had committed different violations of the Rules, and the jury responded affirmatively to each question. The jury found that Cantu had: "taken a position that unreasonably increased the costs or other burdens of the case"; "knowingly made a false statement of material fact to a tribunal"; "knowingly offered or used evidence that he knew to be false"; "knowingly disobeyed an obligation under the standing rules of or a ruling by a tribunal" and that conduct was "an open refusal based either on an assertion that no valid obligation [exists]" or on Cantu's "willingness to accept any sanctions arising from such disobedience"; and that Cantu "engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation." The following summary comprises the evidence and argument presented to the jury.

The bankruptcy proceedings were instituted on May 6, 2008, when Cantu filed voluntary bankruptcy petitions seeking reorganization personally and on behalf of Mar-Rox. At the time, the International Bank of Commerce (IBC) was getting ready to foreclose on some of Cantu's properties, so Cantu acted quickly to file bankruptcy and prevent the foreclosures. A friend who practiced bankruptcy law filed the voluntary bankruptcy petitions for Cantu, but shortly thereafter, Cantu hired a bankruptcy specialist, Ellen Stone, who represented him until July 13, 2009 when she withdrew from the case. Judge Richard Schmidt (Judge Schmidt)[2] presided over Cantu's bankruptcy proceedings, and Judge Isgur presided over all the adversary proceedings, or lawsuits, that arose during and from Cantu's bankruptcy. There were between sixteen and twenty adversary proceedings filed during the course of Cantu's bankruptcy.

---

[2] Judge Schmidt has no relationship to trustee Schmidt.

5

On December 9, 2009, Schmidt and some of Cantu's creditors filed an adversary proceeding asking the bankruptcy court to deny Cantu a bankruptcy discharge. Judge Isgur presided over this adversary proceeding and held a two-day trial, considering testimony from Cantu and other witnesses, and ultimately denied Cantu's bankruptcy discharge with a seventy-two-page memorandum opinion detailing his reasons for the denial. Judge Isgur provided a copy of this opinion to the State Bar of Texas and to the Chief Judge of the District Court of the Southern District of Texas. The course of the bankruptcy proceedings, as detailed in Judge Isgur's memorandum opinion, formed the basis of the Commission's complaint against Cantu.

As discussed at trial and as shown in the record, Cantu signed the bankruptcy petitions, which included descriptions of the debtors' assets and liabilities in the bankruptcy schedules and the statement of financial affairs, and his signature included the statement that he was declaring under penalty of perjury that the information provided in the petitions was true and correct. On July 18, 2008, Cantu filed a first amended set of bankruptcy schedules. In signing them, Cantu also filed a "Declaration Under Penalty of Perjury" that he had read the schedules and that they were true and correct to the best of his knowledge, information, and belief.

In testimony and documentary evidence, Schmidt, Judge Isgur, Cantu, and Sather all agreed that the bankruptcy documentation filed by Cantu failed to correctly identify Cantu's assets, liabilities, and transactions. Schmidt testified that a debtor has an obligation to make a complete disclosure of the debtor's financial condition and a continuing duty to file amended schedules and statements to correct the disclosures. Schmidt testified that Cantu never corrected his bankruptcy filings to include omitted

6

property and transactions. Schmidt testified that Cantu "concealed assets and transferred assets when he shouldn't have been doing that, and—basically he was not honest and forthright on his bankruptcy schedules that he filed in the case."

Judge Isgur's memorandum opinion further provides that a debtor has a "continuing, affirmative duty to provide complete, accurate schedules and a Statement of Financial Affairs." Judge Isgur testified that he denied Cantu's discharge, in part, because he displayed a pattern of "omission." Judge Isgur testified that: "I specifically found that he had given false oaths in the bankruptcy court. I found that he had improperly concealed and transferred assets that belonged to the bankruptcy case." Judge Isgur also testified that Cantu had "withheld information from the trustee." Judge Isgur's memorandum opinion states that Cantu's bankruptcy schedules and statement of financial affairs failed to include "significant assets and transactions."

The testimony and trial evidence regarding this allegation focused on several different categories of property that Cantu failed to identify and include in his bankruptcy estate: Mar-Rox water damage claims, Cantu's contingency fee interests in personal injury lawsuits, Cantu's own personal injury lawsuit, and his ownership of bronze statuary. The jury also heard testimony that Cantu sold jewelry within two years prior to the bankruptcy without disclosing those sales. Additionally, the parties discussed a transaction whereby Cantu obtained funds and, rather than identifying them for the bankruptcy estate, utilized them to, inter alia, pay a friend $50,000. The specific evidence regarding these assets and transactions is as follows.

Schmidt testified that Cantu was obligated to disclose cases in litigation on his bankruptcy filings by identifying them as personal property or pending litigation, or both.

7

Schmidt testified that Cantu had a duty to disclose contingency fee cases generally because he was required to disclose his assets, and specifically, because Judge Schmidt had ordered him to disclose all his contingency fee cases. While Cantu did identify some contingency fee cases for the bankruptcy court, he did not identify them all. Schmidt testified that Cantu failed to identify five water damage claims owned by Mar-Rox. Schmidt testified that he did not learn about these cases until attorneys on the cases called him and asked him what to do with the proceeds of the lawsuits. These cases netted the bankruptcy estate approximately $30,000.

Judge Isgur's memorandum opinion stated that Cantu failed to disclose the cases on Mar-Rox's schedules or statement of financial affairs, or when he amended the schedules in September 2008, or in the conversion schedules when the case was converted to a Chapter 7 proceeding. The memorandum opinion stated that Cantu testified in the adversary proceeding that he instructed Mar-Rox's counsel to contact the trustee but that Cantu did not contact the trustee personally. Judge Isgur noted that Cantu "is a practicing attorney, and he had an affirmative duty to ensure the accuracy of the schedules and Statement." The opinion stated that Cantu's failure to disclose the water damage cases "stem[med] either from fraudulent intent or reckless disregard for the truth."

At trial, Cantu testified that he disputed Judge Isgur's conclusions in the opinion and averred that he "did disclose [the cases.]" He testified that Marc Gravely, the attorney handling the cases, called him and told him he had "some money" on the cases. Cantu testified that he told Gravely to call Schmidt because "[i]t belongs to [him]." Cantu conceded that Gravely did not recall that conversation. Cantu also testified that he did not

8

list these cases in the bankruptcy because he "thought they were already closed." He repeated that "[a]ll my water cases were closed."

Schmidt further testified that Cantu failed to identify cases in which he possessed a contingency fee interest as a practicing attorney. Judge Isgur's memorandum opinion stated that when the bankruptcy case was converted, Cantu gave Schmidt a "stack" of contingency fee contracts; however, Cantu did not disclose all the cases in which he possessed a financial interest. At trial, Cantu admitted that he did not disclose either the *Summit* or *Moreno* case as contingent receivables.

The *Summit* case was a water damage case that Cantu had referred to Gravely. Cantu testified that he told Gravely to tell Schmidt when it settled; however, Gravely provided testimony in the bankruptcy case that he did not recall whether Cantu gave him that directive. Gravely ultimately contacted Schmidt and that case generated $18,500 in fees for the bankruptcy estate.

The *Moreno* case was handled by Cantu's former associates. According to Judge Isgur's memorandum opinion, Cantu testified in the adversary proceeding that an ex-associate handled the case, and he did not realize that the associate had taken the case with him when he left or that he retained an interest in it. He told the bankruptcy court that the *Moreno* case "was later cleared out" and he "got zero on the case."

In this case, Cantu testified that the *Moreno* case belonged to an associate who worked for him, he was not aware that he retained a percentage of the case, and he did not have a file on the case. He asserted that when "they" called him and told him he was going to receive money on the case, he told them "that belongs to [Schmidt]." Upon cross-examination, the Commission referenced the transcript of Cantu's testimony during the

9

adversary proceeding, and Cantu ultimately admitted that he "may have" testified to the bankruptcy court that the case went to arbitration, and he "may have" told the court that the arbitrator had awarded them "zero." Contrary to those statements, Cantu testified at trial that "I think that they got some money, but I don't know how much . . . ." Judge Isgur's memorandum opinion stated that the case generated a referral fee after settlement, and the bankruptcy estate received $6,600 in fees.

Schmidt further testified that Cantu failed to identify and include his own personal injury medical malpractice case in his bankruptcy filings. Before filing bankruptcy, Cantu sued Dr. Pankaj Shah, an ophthalmologist, for personal injuries allegedly suffered as a result of an operation. In May 2009, while he was in bankruptcy, Cantu settled the case for $34,000.

Schmidt testified that he discovered the existence of this lawsuit when defense counsel representing the doctor called Schmidt and told him that the doctor had paid Cantu in settlement of his claims. Schmidt testified that Cantu was required to disclose this lawsuit and obtain approval from the court to settle the case because it belonged to the bankruptcy estate. Instead, Schmidt had to ask the bankruptcy court to order Cantu to disclose the lawsuit and its settlement. The bankruptcy court agreed and entered an order requiring Cantu to disclose the settlement and turn over the proceeds. However, by that time, Cantu had already spent the settlement proceeds and thus they were not put into the bankruptcy estate. Judge Isgur's opinion stated that Cantu deliberately concealed the settlement funds and that Cantu's action in spending the settlement proceeds without authorization from the bankruptcy court constituted an improper transfer of estate assets.

10

At trial, Cantu asserted that this medical malpractice lawsuit was his "personal case" for injuries sustained in an operation and that the lawsuit did not belong to the bankruptcy estate. Cantu's expert Sather testified that Cantu believed that he did not need to disclose the lawsuit because it was his personal medical malpractice lawsuit, but "he was wrong about that." Sather noted that Katherine Julia, Cantu's attorney in that case, received a contingency fee for representing him and Schmidt could have tried to have Julia return the fee to the bankruptcy estate if he found the settlement inappropriate.

Julia testified that Cantu's medical malpractice case "had long since been over" when Schmidt contacted her regarding the lawsuit. She provided him with a breakdown of the monies that they received on the case and confirmed that Schmidt did not ask her to return her contingency fee.

Cantu further failed to disclose several jewelry sales that occurred prior to bankruptcy. Schmidt testified that Cantu was required to disclose transfers of property, other than property transferred in the ordinary course of business, for the two years preceding the filing of bankruptcy in his statement of financial affairs. Schmidt testified that he discovered these jewelry transactions when one of the plaintiffs in an adversary proceeding filed against Cantu subpoenaed local jewelry stores. According to Judge Isgur's memorandum opinion, Cantu failed to disclose the following transactions: (1) five jewelry sales occurring from February 2007 to March 25, 2008, to Shannon Fine Jewelers totaling $26,250.00; (2) one jewelry sale on May 11, 2006, to Regency Jewelers for $48,000.00; (3) one sale of diamonds on October 6, 2007, to Regency Jewelers for $23,325.00, and (4) the sale of another diamond on October 17, 2007, for $36,000.00. The total renumeration for the jewelry sales that Cantu failed to identify or disclose was

$134,575.00.[3] According to Schmidt's cross-examination, Cantu mentioned the jewelry sales in a deposition; however, Schmidt was not present and was not informed about the sales.

Cantu testified that it was his attorney's job to disclose these transactions. Likewise, Sather testified that Cantu's attorney should have asked him to provide the bankruptcy court with the records on the jewelry sales. Cantu reviewed the perjury statement on the bankruptcy forms regarding property transferred within the two years preceding bankruptcy and agreed that "people should be responsible for things that they sign but never read."

At a creditors' meeting held during the pendency of the bankruptcy, Cantu disclosed that he owned two large bronze statues of horses. Schmidt first became aware of their existence at that meeting. Cantu had stored the horses at one of his properties but moved them in 2009 when that property was foreclosed. Schmidt testified that Cantu took two different positions regarding the horses: at the creditors' meeting in bankruptcy, Cantu stated that the horses belonged to him; whereas in the adversary proceeding that resulted in the denial of the bankruptcy discharge, Cantu testified that the horses belonged to his sister. Judge Isgur's memorandum opinion confirms this conflicting testimony and provides additional details.

According to the memorandum opinion, Cantu purchased the horses in Las Vegas for $20,000 in August 2005. Cantu testified at the creditors' meeting that the horses belonged to him, but he was storing them at his sister's property because they were "huge" and he "didn't know where to store them." And while Cantu testified at the

---

[3] The trial testimony regarding these amounts is slightly different. This discrepancy is not material to our analysis.

adversarial proceeding that he gave the horses to his sister in 2005, other evidence adduced at that proceeding indicated that Cantu planned to use the horses for landscaping.

In this trial, Cantu acknowledged that he failed to turn over the horses and that they were not exempt property. He testified that he bought the horses for his sister but acknowledged that he did not disclose that gift on the bankruptcy forms. Judge Isgur concluded that Cantu "improperly concealed" and "intentionally hid" the horses at his sister's house. Schmidt testified that if the horses belonged to Cantu, he should have identified them on a property schedule, and if he had given them to his sister, he should have disclosed the gift on his statement of financial affairs. Schmidt testified that the failure to list them was "a false oath" and it was "definitely" "material" to the bankruptcy estate. Schmidt had to retrieve the horses and sell them both at an auction. Schmidt testified that he received approximately "half" of the alleged purchase price when he sold them, and other testimony indicated that their sale only netted the estate around $4,000.00.

During the course of the bankruptcy, Cantu received a settlement of $150,000 from IBC in one of the adversary proceedings. According to Judge Isgur's opinion, at one of the bankruptcy hearings, the court asked Cantu how he had spent the $150,000, and Cantu testified under oath that the money had been spent on payroll for his law office, a light bill, and the bill for an expert witness in a client's case. Cantu did not disclose that he had transferred $50,000 of those funds to a friend, Baldemar Perez. The bankruptcy court thereafter discovered Cantu's $50,000 transfer to Perez, and subsequently ordered Cantu's accountant to prepare an analysis regarding how Cantu spent the $150,000

13

settlement from IBC. According to the accountant's report, Cantu paid $50,000 to Perez, $45,000 to his bankruptcy attorney, and the remainder as payments to an investigator, car loans, the home mortgagor, and employees at Cantu's law office. In the underlying adversary proceeding, Cantu stated that the payment to Perez "skipped" his mind. Judge Isgur's opinion concluded that Cantu "transferred the $50,000 with clear intent to hinder, delay, or defraud his creditors."

In this trial, Cantu testified that Perez had loaned him money to obtain experts for his cases. He stated that he did not know why he did not disclose the payment to Perez and noted that he disclosed much smaller transfers in his bankruptcy filings. Cantu testified that he did not remember whether he told his bankruptcy attorney about the Perez transfer. Cantu testified that he was not trying to hide this payment and pointed out that he had written Perez a check from his debtor in possession bank account. Sather similarly testified that the bankruptcy trustee can see the debtor in possession bank accounts at any time, so Cantu was not trying to conceal the transaction from Schmidt. Sather testified that Cantu was apparently told that he could spend the funds in a debtor in possession account as he wished, within reason, but Sather stated that was "absolutely" not correct. Sather stated that a debtor cannot pay a prepetition debt without court approval. According to Sather, the check to Perez would be considered an "unauthorized postpetition transfer." Ultimately, Perez returned the funds to the bankruptcy estate.

Schmidt testified that the statement of financial affairs requires a debtor to disclose if he is holding property that belongs to someone else, but Cantu failed to disclose all property that fell within this category. Cantu disclosed that he was holding an office building called TRIGO for his children, but failed to identify, for instance, the bronze

14

horses that he intermittently alleged he was holding for his sister. Judge Isgur's memorandum opinion further states that Cantu claimed that several pieces of furniture held at his office were owned by others after the court entered an order authorizing the sale of the majority of Cantu's office equipment and furniture. In addressing this category of items, Sather discussed a desk and chair owned by an employee, a desk owned by Cantu's father-in-law, and rugs owned by Cantu's sister. Sather stated that these items "certainly should have been listed" as property held for others.

At trial, Cantu asserted that it was his bankruptcy attorney's responsibility to correctly complete and disclose his financial assets, liabilities, and transactions, and that she failed to do so. He asserted that Stone committed malpractice in representing him, he sued her for malpractice, and her insurance company paid policy limits to settle his claims against her.

Cantu testified that Stone was responsible for "laying the framework" for the errors and omissions in his bankruptcy filings. He testified that she "did all the listing of everything," and that he "had never done a bankruptcy in [his] career" and it was "foreign" to him. According to Cantu, "[s]he did not list a lot of things that she should have listed." Cantu stated that she prepared the paperwork, and he signed it. Cantu told the jury that he was there in court "defending her actions" and told the jury that she was "responsible for [the] failure to list [the] property on the statements of financial affairs." He conceded that he signed his statement of financial affairs and the amended statement of financial affairs under penalty of perjury; however, he did not read them to see what he was signing. He testified that he "[u]sually" reads things in other lawsuits before signing them. He "thought [his attorney] had covered everything." Cantu acknowledged that she

15

stopped representing him during the bankruptcy shortly after the conversion from Chapter 11 reorganization to Chapter 7 liquidation. Cantu first testified that he did not file conversion schedules at the time of the change, then later testified that he did not remember if he filed them.

Schmidt testified that he intervened in Cantu's legal malpractice case against his bankruptcy attorney because any proceeds of that lawsuit constituted property of the bankruptcy estate and noted that Cantu did not request permission from the bankruptcy court before filing suit. According to Schmidt, they litigated who owned that lawsuit and the Fifth Circuit Court of Appeals ultimately determined that the claim belonged to the bankruptcy estate.

Sather, who was originally retained as an expert in Cantu's legal malpractice case, testified that Cantu's bankruptcy attorney had only handled four Chapter 11 proceedings before representing Cantu, that she failed to meet the standard of care for an attorney representing a debtor in a Chapter 11 case, and that was a proximate cause of damages to Cantu.

Julia testified that she and Sather believed that the legal malpractice claim belonged to Cantu individually. She further testified that she believed that Schmidt had no intention of prosecuting the malpractice claim. She said that she was not paid for her services in the case, Cantu received nothing, and Schmidt and the bankruptcy estate received the settlement proceeds.

Sather testified that debtors are required to file two sets of "mandatory" documents: schedules, which list liabilities, income and expenses, and statements of financial affairs. He testified that individuals who file for bankruptcy in emergency situations, as did Cantu,

16

are generally "extremely stressed" and "frenzied." He stated that "no matter how thoroughly you interview the client, there are almost always some items that do not make it into the schedules and that require amendment." He testified that the bankruptcy rules allow amendment of the forms and schedules at any time and impose a duty to correct anything that is omitted or inaccurate. Sather testified that Cantu's bankruptcy lawyer prepared the schedules and statement of financial affairs and his accountant prepared the monthly operating reports. Sather stated that "initially it's always the debtor's obligation" to amend the schedules to add property, but "a competent lawyer will remind the debtor of that obligation and basically beat on them until they do it." He noted that an amendment "may or may not help your client because the Court has to make a determination of the reason for the initial omission" but it "mitigates the damage" and "fulfills your obligation as an officer of the Court to make complete disclosure." He testified that if a bankruptcy lawyer learns of something that a debtor has omitted, the lawyer asks the debtor to amend, and if they refuse, then the attorney would be under a duty to withdraw from representation. He noted that Cantu's bankruptcy attorney did not amend Cantu's filings after Cantu revealed the existence of the omitted items.

Sather testified that Cantu's bankruptcy attorney prepared the schedules and her husband, an accountant, prepared the statement of financial affairs. Sather testified that it was unusual that the bankruptcy attorney and accountant were related because the relationship presented a potential financial conflict. Sather testified that Cantu was represented by the same bankruptcy attorney until shortly after the case was converted to chapter 7.

17

Sather testified that "most clients fail to understand" the bankruptcy provision requiring them to detail transfers that are not made in the ordinary course of business within two years preceding the bankruptcy filing. He stated that it was his experience that the statement of financial affairs was "one of the areas that's most likely to be misunderstood by a client and where you're most likely to find omissions." He further testified that the bankruptcy forms regarding property held for others are often completed incorrectly because the forms are "counterintuitive." He stated that it was very common for debtors to liquidate their assets to stay afloat or dispose of assets for the purpose of keeping them out of the hands of creditors. He asserted that there was nothing inherently wrong in a debtor selling property, but that the disclosure obligation exists so that creditors can check the transactions. Sather testified that if a debtor amended his statement of financial affairs, "it would mean that the debtor had complied with his duty even though it was belatedly, and it would tend to show the—that the omission was more likely to be the result of an honest oversight rather than an intentional omission." Sather testified that Cantu's lawyer had a duty to help him to make sure his forms were complete. He stated that "the obligation of the debtor's lawyer is to help the client meet the requirements of Chapter 11 but also to protect them from their own . . . sloppiness or inattention."

Sather testified that one of the complaints against Cantu in the bankruptcy concerned his failure to keep records regarding Mar-Rox and some of his other properties. According to Sather, many of these records would have been produced or prepared before Cantu filed bankruptcy, and Cantu did not realize, in advance, that he would need those records for the bankruptcy proceedings.

Numerous other events occurred during the course of the bankruptcy which were at issue during the trial. On June 24, 2009, Judge Schmidt signed an order converting the bankruptcies from Chapter 11 to Chapter 7 on grounds that "the Debtors' Chapter 11 Plan of Reorganization is not confirmable." Sather testified that Cantu's creditors had approved the reorganization plan, but the bankruptcy judge did not. According to Sather, Cantu's bankruptcy attorney committed fundamental mistakes in preparing the plan that prevented it from being confirmed. The plan was amended several different times without confirmation. Schmidt testified that the bankruptcy was converted because Cantu "never offered what is called a feasible plan, a plan that would work, and he never satisfied his creditors, nor did he satisfy the bankruptcy court that his plan would work."

Schmidt explained that a Chapter 11 proceeding is one where the debtor is in possession or control of the bankruptcy estate. The debtor can generally conduct business as usual, with the obligation to act in the best interests of the creditors and can present a plan of reorganization to the bankruptcy court, which, if approved, allows the debtor to pay off his debts over time. In contrast, in a Chapter 7 proceeding, the debtor's assets pass to a trustee for liquidation to cash so that the trustee can pay the debtor's creditors. In a Chapter 7 liquidation, the trustee has the statutory obligation and duty to collect all the debtor's assets and "get the best price attainable" for the assets that he is selling. The trustee notifies everyone involved in the case when an asset is being sold, and for what price, and obtains the bankruptcy court's approval. Schmidt testified that both types of bankruptcy proceedings are subject to an automatic stay which prevents creditors from attempting to collect debts or foreclose on assets.

When Judge Schmidt converted Cantu's bankruptcy to a Chapter 7 proceeding, Schmidt was appointed as the trustee for the bankruptcy estate. As stated previously, Cantu's bankruptcy attorney, whom he alleged committed malpractice, withdrew from the case shortly after the conversion to Chapter 7. During the period after conversion, Cantu was represented by approximately eight different attorneys, who each handled different parts of the proceedings, and Cantu also represented himself.

On July 13, 2009, Judge Schmidt signed an "Order Granting Motion Ordering Debtors to Attend 341 Meeting and Directing Production of Requested Items." This order required Cantu to appear and produce (1) all jewelry to allow the trustee to inspect and appraise it; (2) a list identifying all jewelry, collectibles, and artwork sold, including dates and prices, with supporting documentation; (3) a list and appraisals on all artwork and collectibles; (4) all documentation on real estate, stocks and interest in business entities, and all other property sold or transferred within the last four years; (4) tax returns for three years; (5) all bank statements including the Chapter 11 debtor in possession account from January 2001 through June 2009.

On September 30, 2009, Judge Schmidt issued an "Order Granting Objections to Debtors' Exemptions." This order categorized various items of personal property as exempt or nonexempt property and concluded that Cantu's "artwork, lithographs, and statues" were nonexempt, as were "all assets" of Cantu's law office. This order required Cantu to turn over physical possession of all nonexempt property "immediately, but in no event later" than five days from the date of the order.

According to Schmidt's testimony and Judge Isgur's opinion, Cantu failed to turn over the nonexempt property within five days. On October 13, 2009, Schmidt went to the

20

Atrium where Cantu maintained his law offices with a moving crew to remove Cantu's office furniture as nonexempt property. He moved the furniture out of Cantu's law office, placed it in an empty space across the hall, and changed the locks. Schmidt testified that during this process, Cantu arrived and told Schmidt that United States District Judge Randy Crane had issued a temporary restraining order preventing Schmidt from removing the property. Schmidt testified that he called Judge Crane's court manager who informed him that Judge Crane had denied Cantu's request for a temporary restraining order, contrary to Cantu's statements otherwise.

Schmidt proceeded to remove the non-exempt property except for artwork which had been locked in place with a security system. Judge Isgur's opinion states that Cantu had been ordered to facilitate the turnover of the art by having a security company disable the security system; however, he did not do so. Schmidt testified that he had to obtain a separate order to obtain the artwork, thereby spending more money from the bankruptcy estate.

At trial, Cantu specifically denied that he told Schmidt that Judge Crane had granted the temporary restraining order and instead told Schmidt that he merely filed a request for a temporary restraining order. Then, when cross-examined regarding whether he had misrepresented Judge Crane's ruling, Cantu testified that "I don't remember. I may have, sir. I told him I had filed it. I don't know if I told him that the judge had granted it or not." Judge Isgur's opinion concluded that Cantu "lied" about the existence of a temporary restraining order and failed to comply with specific orders to facilitate the removal of the artwork.

21

Sather testified that the bankruptcy code allows a debtor to ask for an injunction to try to stop a sale and that Cantu was not dishonest or fraudulent in filing a request for a temporary restraining order. He testified instead that Cantu was "desperate" and was "aggressively" pursuing his rights under the bankruptcy code.

Schmidt also testified that Cantu interfered with the sale of estate assets during the bankruptcy. Schmidt offered testimony regarding his sale of Cor-Can, Inc. (Cor-Can). Cantu had owned 45 percent of the stock of Cor-Can and Tomas Corona owned 55 percent. According to the record, Cor-Can was an air conditioning business that owned realty in the form of a warehouse or office building. Schmidt had received authorization from the bankruptcy court to sell Cantu's interest in Cor-Can to Corona for approximately $218,000. Cantu objected to the sale and filed suit against Corona in state court, and Schmidt removed it to the bankruptcy court as an adversary proceeding. Schmidt testified that he was required to hire counsel to defend the case and it caused additional administrative costs to the bankruptcy estate.

On October 19, 2009 Judge Isgur signed an "Order Dismissing Adversary Proceeding" which dismissed Cantu's claims against Corona. This order provides that "[p]laintiff is cautioned that the filing of this lawsuit was frivolous. Further frivolous conduct will not be tolerated." Judge Isgur announced this ruling in Cantu's presence.

Schmidt testified that, nevertheless, after that order, Cantu "continued to interfere in my attempts to close the sale of that stock." The day after Judge Isgur signed his order dismissing Cantu's lawsuit and warning him against engaging in further frivolous conduct, Cantu filed a lis pendens against Cor-Can's interests claiming an interest in real estate. Schmidt noted that Cantu's interest in Cor-Can consisted of stock and not real estate.

22

Again, Schmidt had to respond to Cantu's actions. Schmidt testified that Judge Isgur "threatened to put [Cantu] in jail" until he signed a release of the lis pendens.

Cantu confirmed this testimony and stated that Judge Isgur threatened to arrest him if he did not sign the order lifting the lis pendens, so he signed the order and dismissed it as "the only logical thing to protect me and my family." At trial, Cantu testified that a "lis pendens is not a lawsuit," but is "something you file with the clerk saying that there is a lawsuit on file." He acknowledged that this was an attempt to stop Schmidt from selling his interest in Cor-Can and stated that he "didn't want the property sold to Tomas Corona." Sather testified that the filing of the lis pendens did not cause "lasting harm" to the bankruptcy other than the "annoyance factor."

At trial, Cantu stated that he did not remember if he originally claimed that he was unaware of Judge Isgur's order dismissing the Cor-Can lawsuit and concluding that it was frivolous but upon cross-examination, acknowledged that a bankruptcy transcript showed that he provided that testimony. Cantu admitted that he knew that the case had been dismissed as being frivolous before he filed his lis pendens and argued that he did not deny that knowledge to the bankruptcy court, "but it is what it is."

Schmidt testified that, despite the foregoing, Cantu continued to interfere with the sale of his Cor-Can interest by threatening more litigation. The record includes Cantu's October 29, 2009 letter to Dianne Bartek, counsel for IBC, stating that:

> This letter is to inform you that today Judge Isgur forced me to withdraw my Lis Pendens or be sent to jail. I, of course, complied against my belief that I have a proper lawsuit against Michael Schmidt, trustee because on one hand he has a duty to recover for my estate the $130,000.00 wrongfully received by Tomas Corona for rents paid to him which he did not distribute to my estate; and on the other hand selling him my interest for $180,000.00.

23

> I write this letter to advice you and your client International Bank of Commerce that I am going to appeal . . . Judge Isgur's Order and that if your client IBC provides financing for Mr. Tomas Corona's purchase they may very well find themselves in a lawsuit involving conspiracy charges against IBC for knowingly lending money to Mr. Corona when they are aware of the ongoing litigation.
>
> This letter serves to put you and IBC on notice so that there will be no questions about my feelings concerning this matter.
>
> Also, please be advised that this afternoon I will be filing an expedited motion with Judge Schmidt asking for permission to bring a lawsuit against Michael Schmidt, Trustee.

At trial, Cantu stated that he sent this letter because the "order [authorizing sale] is not final until 21 days after [the judge] signs it," and he had that time to "do anything that I need to do in—in order to perfect the appeal." Schmidt testified that he responded to this threat by filing a motion to stop Cantu and to sanction him.

On November 4, 2009, Judge Isgur signed an "Order Granting in Part and Denying in Part Motion for Sanctions and Injunction." According to this order, Schmidt as Chapter 7 trustee had sought sanctions and an injunction order against Cantu. The order stated that Schmidt, Corona, Cor-Can, and their attorneys, officers, and others "may perform and close" the sales transaction authorized by Judge Schmidt on October 7, 2009. The order prohibited lawsuits for actions regarding Judge Schmidt's order, and the instant order, and advised that "[c]oncerns over the correctness of the orders" should be addressed by appeal or motion for reconsideration. The order awarded Schmidt reasonable attorney's fees and costs for filing the motion in an amount to be determined at a future date. In relevant part, the order addressed misconduct on the part of Cantu:

> 4.      Mr. Cantu is ordered to cease violating the automatic stay imposed by 11 U.S.C. § 362(a). Future violations of the automatic stay will be treated as actions in contempt of court.

24

5. At the hearing on October 19, 2009, the Court cautioned Mr. Cantu that he was filing frivolous complaints and that similar conduct would not be tolerated in the future. On October 29, 2009, the Court announced that it would award compensatory sanctions to the Trustee and against Mr. Cantu for actions taken by Cantu in violation of the stay. This order again imposes compensatory sanctions for actions taken in violation of the stay. Mr. Cantu is cautioned that future inappropriate conduct may (and likely will) result in the imposition of compensatory or coercive monetary sanctions that may be collected from his exempt assets . . . .

According to Judge Isgur's opinion, Cantu's action in filing the notice of lis pendens and threatening IBC with suit "constituted a refusal to comply with the Court's dismissal order." Judge Isgur's opinion stated that Cantu knew that the adversary proceeding had been dismissed as frivolous when he filed the lis pendens.

In the November 20, 2009 "Order on Trustee's Sanction Motion Against Cantu for Vexatious and Multiple Filings (Docket #1451)", Judge Schmidt denied the trustee's motion seeking sanctions against Cantu for vexatious and multiple filings. However, Judge Schmidt further concluded:

As set forth on the record, the Court does find that Mark Cantu, and his law offices ("Cantu") have engaged in conduct that have unnecessarily multiplied the proceedings in these Cases and therefore unreasonably increased the Estate's cost of administration. Cantu has also unreasonably interfered with the Trustee's proper administration of these converted Cases. The Court orders Cantu to cease and desist from further similar conduct.

Schmidt testified that Cantu did not appeal this order. Schmidt testified that it was issued because Cantu failed to comply with court orders, and he interfered with the administration of the estate. Schmidt testified that Cantu "interfered with all of my sale efforts" and "tried to hamstring my sale efforts" despite the fact that he lacked any financial stake in the outcome.

25

By order issued on December 29, 2009, Judge Isgur awarded Schmidt legal fees and expenses of $6,781.61. The order required Cantu to pay Schmidt "not later than" fifteen days after entry of the order. Schmidt testified that Cantu did not pay him as required by the order.

On October 16, 2009, Judge Schmidt signed an "Order Following Eviction Hearing (Mark Cantu)." This order, inter alia, allowed Cantu to occupy a new amount of space at the Atrium but required him to pay rent monthly on a per-square-foot basis and further required Cantu to turn over "all art work and other collectibles" at his office space because they had previously been found to be property of the bankruptcy estate. The order provided for eviction if Cantu failed to pay the rent. The order referenced that the "art security hanging system" needed to be disabled and the artwork delivered to Schmidt.

On February 16, 2010, Judge Schmidt signed an "Order Authorizing Sale Free and Clear of Liens, Claims and Interests and Terminating Month to Month Lease (docket #1642)." According to this order, Schmidt had filed a motion to sell the Atrium and the bankruptcy estate's interest in another building and had notified Cantu that his lease would terminate on February 28, 2010. The bankruptcy court held a hearing on the motion on February 10, 2010. Judge Schmidt's order states:

> At the hearing, the debtor represented to the Court that he had an agreement with the buyer's attorney to remain in the premises. On instruction from the Court, the Trustee contacted the buyer's attorney to confirm the Debtor[']s representation, but was unable to do so. On February 11, 2010, the Trustee notified the Court on the record and filed of record a notice that the buyer did not agree to allow the Debtor to remain in the premises an additional 90 days and will not close the sale until the space is vacant.

26

This order granted Schmidt's motion to sell the property for $2,750,000 free of any liens, terminated Cantu's month-to-month lease, and ordered him to vacate the property on or before March 10, 2010.

Schmidt testified that Cantu tried to stop the sale of the building even though the building was part of the bankruptcy estate. On February 26, 2010, Cantu sent a letter to the attorney for the title company, Antonio Villeda, which stated in part:

> Enclosed you will find my Debtor's Notice of Appeal of Order Authorizing Sale and Terminating Month to [Month] Lease entered by the Honorable Richard Schmidt on February 16, 2010.
>
> Out of an abundance of caution I am notifying you and your title company that this may have ramifications . . . . Obviously if your clients get title insurance they [sic] be protected for their 2.7 million dollars sale price on the two properties they are buying; namely the Atrium Office Bldg. and the Ranchito Restaurant located north of the Atrium . . . .
>
> Also be advised we have appealed the wrongful Order converting me to a Chapter 7 . . . at the 5th Circuit Court of Appeals of New Orleans which could [affect] the authority of the trustee Michael Schmidt[] selling these properties as well. . . . Additionally, the Motion to Dismiss which was wrongfully denied by Judge Richard Schmidt has been appealed to Judge Ricardo Hinojosa in that Judge Schmidt did not follow the law or apply the appropriate factors in dismissing the case.
>
> These are three potential [bases] for my retaining ownership of this property despite any transactions between your client and the trustee. Although a lis pendens has not been filed pursuant to bankruptcy law this letter will serve as notice to you that they may be buying nothing for 2.7 million dollars, unless as I stated earlier in this letter the title company is willing to roll the dice on this amount of money.
>
> Further, since your client did not extend to me the courtesy of moving out of my office by April 10, 2010, I have this morning filed a motion asking Judge Schmidt to stay his order of February 16, 2010, ordering me to vacate the premises by March 10, 2010 and if he denies my emergency motion for a stay, I will be filing an Application for Temporary Restraining Order with the district court next week.

Judge Isgur's opinion states that Cantu "had already been sanctioned for similar conduct in the Cor-Can adversary" proceeding and was "specifically warned against interference with the administration of the estate." Judge Isgur concluded that Cantu's conduct in threatening the purchaser of the Atrium and the title company with a lawsuit was "unambiguously interference in the administration of the estate" and that "Cantu knowingly and willfully refused to comply with the lawful cease-and-desist order."

On February 17, 2011, Judge Isgur issued his Memorandum Opinion denying Cantu's bankruptcy discharge as a result of false oaths, improper concealment and transfer of estate assets, refusal to comply with court orders, failure to keep adequate records, and withholding information from the trustee. As stated previously, the memorandum opinion is seventy-two pages long and was redacted before it was introduced into evidence. Although Cantu originally appealed Judge Isgur's denial of his bankruptcy discharge, he ultimately dismissed that appeal.

At trial, Judge Isgur recounted some of the events detailed in the memorandum opinion and further testified regarding his experiences with Cantu and the conclusions that he drew from those events. Judge Isgur testified that he had denied discharge only twelve to twenty times over the course of a dozen years that he had served as a bankruptcy judge. Judge Isgur testified that he denied discharge because he determined that Cantu:

- "displayed a pattern of omission, obfuscation and noncompliance,"

- "had given false oaths in the bankruptcy court,"

- "had improperly concealed and transferred assets that belonged to the bankruptcy case,"

- "refused to comply with lawful court orders,"

- "failed to keep adequate records as required by Section 727(a)3 of the Bankruptcy Code," and

- "withheld information from the trustee in violation of Section 727(a)4(d) of the Bankruptcy Code."

In his testimony, Judge Isgur reiterated that Cantu "had made false oaths, "refused to comply with lawful court orders," "failed to keep adequate records," and "improperly withheld information from the trustee." Judge Isgur testified that each of these reasons "independently" served to deny Cantu's discharge. Judge Isgur testified that he denied discharge after hearing all the evidence in the adversary proceeding, and the memorandum opinion represented his "decisions about different contested issues." He acknowledged that he determined which witnesses were more credible based on the evidence he received.

Judge Isgur testified that he received a flat salary for his service as a bankruptcy judge and he received no personal gain from Cantu's bankruptcy. He testified that he had "personal ill will" toward Cantu "[o]nly for one thing." Judge Isgur stated that Cantu "disobeyed lawful orders of the Court, and I believe that I do hold some hard feelings about someone that violates orders of the Court, but beyond that, I do not have any animosity at all to him." Judge Isgur was subpoenaed to appear at trial, but he seemed to acknowledge that he appeared for his deposition and for trial voluntarily, and that the Commission or State Bar was reimbursing his expenses.

At trial, Schmidt testified that he had a "statutory duty" to object to discharge in certain cases and Cantu's was an "appropriate" case. He testified that he sought a denial

of discharge because the "circumstances . . . were so egregious that there was a public duty to do so." Schmidt testified that it is "very rare" for a debtor to be denied discharge entirely and he could only recall two cases other than Cantu's in which it had happened. Schmidt acknowledged that he did not like Cantu and "he's a difficult man to like." Schmidt testified that he thought Cantu had sued him twice as trustee, and those lawsuits had been dismissed. Elsewhere in the record, Schmidt testified that Cantu had sued him a total of four times.

Schmidt testified that as a bankruptcy trustee, he is not a salaried government employee but generally receives payment from the small portion of bankruptcy cases that have assets. Schmidt testified that in bankruptcy proceedings he can be employed as an attorney on an hourly contingency fee, which requires an approval process, or he can be paid a statutory rate of three percent of any funds that he distributes to the estate's creditors. The bankruptcy court and all parties are notified when Schmidt submits a fee application, the parties have an opportunity to object to his application, and the fee application is reviewed by the Office of the United States Trustee, a division of the Department of Justice, and the bankruptcy judge. Schmidt testified that he collected "a little over" $700,000 during the course of the Cantu bankruptcy. Cantu objected to all of his fee applications, but no one else objected to any of them. Schmidt testified that the bankruptcy court had approved all of his fee applications at the time of trial.

At trial, Schmidt testified that he was not being paid for his time or compensated for his expenses, but Cantu showed otherwise with Schmidt's applications for attorney's fees that encompassed Schmidt's time on the Commission's disciplinary proceeding against Cantu. Schmidt characterized his testimony otherwise as a misstatement based

on bad memory and stated that it made no difference whether he submitted a bill for such expenses because Cantu's bankruptcy estate lacked funds to pay his bill.

Julia testified that Schmidt appeared as a trial witness in a case involving Cantu, although neither party in that case asked him to appear, and that Schmidt testified in that case against Cantu's interest. She testified that Schmidt billed the bankruptcy estate for twenty-four hours of work on that case, but she did not witness him performing twenty-four hours of work.

Schmidt testified that he distributed $6 million dollars in the Cantu bankruptcy to the secured creditors and as payment for administrative expenses, but the estate lacked money to pay Cantu's unsecured creditors. According to Schmidt, "all of the legal fees that got run up in the case and the other administrative cases basically depleted the money that was available for the unsecured creditors." Schmidt testified that he would not be able to collect the trustee's three percent interest on the $6 million that he had distributed because the estate lacked additional money and assets "so I basically have to eat that."

Judge Isgur testified that he was not surprised that Schmidt made a significant amount of money as trustee on Cantu's bankruptcy:

> And I would not be surprised because Mr. Cantu's actions were the most litigious that I've ever seen in an individual bankruptcy case, and that would have dramatically driven up the expenses in the case, because you have to deal with what he does, and so it would only make sense that there would be very high fees to the lawyers.

Judge Isgur explained that "every time that something occurred where Mr. Cantu interfered with the administration of the estate, they would have to come to court and pay legal fees to get Mr. Cantu to stop because it is expensive to prosecute a dischargeability

31

action where you have a complex series of financial transactions that are hidden." Judge Isgur stated that when someone fails to comply with a court order, "which Mr. Cantu repeatedly did," it costs the estate legal fees to pay for an attorney to "force him to comply with the Court orders." Judge Isgur stated that "you can't do these things without expecting to drive up the legal costs." Judge Isgur testified that the law obligated Schmidt to respond if Cantu's actions would injure the estate, and "in this case many of [Cantu's] actions were injurious," and Schmidt's response to Cantu's actions would have to be done through an attorney. Judge Isgur testified that the bankruptcy code allowed Schmidt to retain his own law firm for representation, and that that Judge Schmidt handled Schmidt's fees in the main bankruptcy case and would have resolved any issues regarding self-dealing on attorney's fees. Judge Isgur further testified that the bankruptcy proceedings provide a system of checks and balances regarding policing the fees and provides opportunities for other parties to object. Sather suggested that Schmidt's fees were extraordinary and that a recent bankruptcy opinion by Judge Isgur suggested that a trustee had a duty to shop different law firms before hiring his own.

Schmidt testified that Cantu filed between sixteen and twenty adversary proceedings during the course of the bankruptcy, ten to fifteen appeals to the district court, and four to six appeals in the Fifth Circuit Court of Appeals. Schmidt acknowledged that Cantu had a right to pursue the appeals. Cantu testified that he believed he filed sixteen adversary proceedings in connection with the bankruptcy, but he did not recall how many appeals.

Cantu testified that he thought that Schmidt was selling his properties for far less than they were worth. Sather testified that a trustee is under a duty to liquidate assets as

32

expeditiously as possible, so the trustee generally does not obtain a good price on the assets he is selling. Cantu acknowledged that when he filed a lawsuit against the trustee, the trustee was obligated to defend against that suit; however, he nevertheless denied that his actions depleted the bankruptcy estate. He further agreed that his actions "had some increase in costs" to the bankruptcy estate. Sather testified that Cantu did not take any positions that "unreasonably" increased the burdens of the case or that "unreasonably" delayed the case. Sather acknowledged that if Cantu was very aggressive in bankruptcy, then it would be a "necessary condition" that the fees incurred in opposing him would increase. Sather acknowledged that he had testified that there was no harm to the bankruptcy estate regarding several of Cantu's contested actions, because, for instance, the horses and check to Perez were ultimately returned to the estate; however, Sather conceded that "in any context the more litigation there is, the higher the expense."

Sather testified that he saw nothing in the documentation that he reviewed, other than Judge Isgur's opinion, that suggested that Cantu was dishonest, fraudulent, deceitful, made misrepresentations, committed fraud, or withheld documents. He stated that the bankruptcy was extremely complex because of the multiple businesses included within the estate. He asserted that Cantu's failure to list some of his assets did not cause harm because the trustee ultimately obtained those assets. He further testified that Cantu's failure to disclose some of his assets "look[ed] to be sloppiness rather than dishonesty." He conceded that he relied on what Cantu told him and that he did not review the transcript of the adversary proceeding which resulted in the denial of Cantu's bankruptcy. Sather testified that a debtor has the obligation to cooperate in the

33

administration of the bankruptcy estate, and Cantu cooperated "in some aspects" but not in others.

Bill Piatt, a former dean and professor of law at St. Mary's School of Law who taught ethics and professional responsibility, testified that Judge Isgur "must have had some bias" against Cantu and "it looked like the judge just didn't like [Cantu]." Piatt said that if anyone acted unethically, it was Judge Isgur because he did not recuse himself when requested to do so and handled the case for two years prior to recusal. He noted in this regard that Judge Isgur signed the memorandum opinion denying discharge on February 17, 2011, but did not recuse himself until September 26, 2013. Piatt testified that Cantu did not commit perjury because he should have been able to rely on his bankruptcy attorney. Piatt testified that "[m]y opinion is that Mark Cantu did nothing unethical in the handling of the bankruptcy case." Piatt testified that aggressiveness is valued in an adversarial legal system. He stated that pursuing a case aggressively as a litigant is not a violation of the ethical rules, but "the rules constrain [lawyers] somewhat in the way that [they] have to conduct [themselves]." He acknowledged that he has no personal knowledge of Cantu's conduct, that he spoke with Cantu about his version of events, and that while he read the deposition testimony of Judge Isgur, a referring attorney, and Sather, he did not read the transcript of the bankruptcy trial on discharge that engendered Judge Isgur's memorandum opinion.

After the jury heard the foregoing evidence, it found against Cantu on all issues submitted to it. The trial court thereafter held a hearing to the bench on the appropriate sanction to be issued against Cantu. At the Commission's request, the judge took judicial notice of the court's file and the various proceedings in the case. At the sanction hearing,

the trial court heard testimony from the counsel for the Commission, Paul Homburg, Cantu, and Roxanne Cantu. Homburg testified regarding the attorney's fees incurred by the Commission in prosecuting the case against Cantu. Cantu testified generally about his personal history, his relationships, and his health. Cantu testified that he was "extremely aggressive" during the course of the bankruptcy, but that he was trying to save his assets for his children so that they "wouldn't have to have the problems that [he] had" growing up without funds. Cantu asserted that his actions in the bankruptcy did not harm any clients, which he thought the rules of professional conduct were meant to prevent. He testified that Judge Isgur did not like him because "I was fighting with his best friend, Michael Schmidt, the trustee, because they were giving away what I had worked 25 years for, giving it away and making money for themselves . . . ." Cantu testified that they "basically" stole everything he had. Cantu testified that during the jury deliberations, he thought he might win the misconduct case when the jury indicated that it was deadlocked, and then "they said the jury reached a verdict and they were eight/four deadlocked, and then they went ten/two, and it went against me." Upon further questioning, Cantu denied that he had any personal knowledge about what the jury was doing and that his testimony was a "wild guess" or "complete guess" based on what his lawyers had told him and the fact that "three or four of the jurors" stayed behind after the case was over and spoke to his lawyers. Roxanne testified, in summary, that Cantu was a good husband, father, friend, and employer.

At the hearing, the Commission offered argument and evidence regarding previous sanctions and findings made regarding Cantu. The parties discussed a previous case in which this Court issued sanctions against Cantu. *See In re Cantu*, 961 S.W.2d 482, 489

35

(Tex. App.—Corpus Christi–Edinburg 1997, orig. proceeding) (en banc), on reh'g (Nov. 20, 1997), order set aside (Feb. 19, 1998). In that case, we had enjoined Cantu from asking for additional relief that would impede or prevent the collection of a final judgment; however, Cantu committed "continuing attempts to prevent and impede execution of that judgment" in violation of our order. *Id.* at 484. We held Cantu in contempt of court and ordered sanctions against him in the form of thirty days of imprisonment and a monetary fine. *Id.* at 490.

The trial court admitted into evidence the April 20, 2000 "Judgment of Partially Probated Suspension" in cause number C-3953-98-E in the 275th District Court of Hidalgo County, Texas, stating that Cantu had committed professional misconduct through violations of Rule 1.06(a) and Rule 1.06(b)(1). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.06(a) ("A lawyer shall not represent opposing parties to the same litigation."); *id.* R. (b)(1) (stating that as a general rule a lawyer shall not represent a person if the representation "involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm").

The trial court also admitted the September 7, 2001 "Judgment of Partially Probated Suspension" in cause number C-164-00-C in the 139th District Court of Hidalgo County, Texas, stating that Cantu had committed professional misconduct in violation of Rule 1.08(a) and Rule 8.04. *See id.* R. 1.08(a) (generally prohibiting lawyers from entering into business transactions with clients unless particular requirements are met); *id.* R. 8.04 (detailing a non-exclusive list of actions that constitute misconduct).

The parties also discussed the supreme court's decision in *Ford Motor Co. v. Castillo*, 444 S.W.3d 616 (Tex. 2014). In that case, the supreme court concluded that there was legally sufficient evidence that Cantu participated in procuring a settlement by fraud. *See id.* at 618.

Homburg requested that the trial court consider the Rule 3.10 factors on assessing an appropriate sanction. *See* TEX. RULES DISCIPLINARY P. R. 3.10.A–L. At the conclusion of the hearing, the trial court took the matter under submission.

The trial court subsequently entered a judgment of disbarment in which the judge concluded that Cantu's conduct as found by the jury constituted professional misconduct in violation of Rules 3.02, 3.03(a)(1), 3.03(a)(5) and 8.04(a)(3) of the Texas Disciplinary Rules of Professional Conduct. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.02, 3.03(a)(1), 3.03(a)(5), 8.04(a)(3). After "considering each of the factors" set out in Rule 3.10, the trial court concluded that disbarment was the "proper discipline." *See* TEX. RULES DISCIPLINARY P. R. 3.10.A–L. The trial court further assessed sanctions against Cantu in the form of attorney's fees. The trial court subsequently issued multiple findings of fact and conclusions of law in support of the judgment.

This appeal ensued. On original appeal to this Court, Cantu presented the following twenty-six issues:

(1)    Is a sitting judge permitted to testify about a matter on which he previously presided?

(2)    Is a federal judge competent to testify in a state court trial without authorization from the appropriate authorities?

(3)    When [the] Commission for Lawyer Discipline fails to correct a false impression created by one of its witnesses, is the United States Constitution violated, mandating an acquittal or a new trial?

37

(4)     Is a witness whom the proponent de-designates as an expert still permitted to provide expert testimony?

(5)     Should judicial opinions be presented as substantive evidence before a jury?

(6)     Does mere reference to a document open the door to its introduction into evidence?

(7)     Does reference to one sentence in a document open the door to introduction of the whole document?

(8)     Does mere experience qualify an attorney as an expert?

(9)     Should expert testimony be allowed if the jury is just as qualified as the expert in making the required determination?

(10)    Does the improper admission of evidence warrant a new trial, when the evidence is hotly disputed?

(11)    If the trial court fails to submit an affirmative defense, is the defendant entitled to a new trial?

(12)    Does the good faith of an attorney constitute a defense to disciplinary proceedings?

(13)    Are statutory commentaries worthless, to be ignored . . . ?

(14)    Is a litigant entitled to a new trial, when a conditional submission deprives him of a fair determination by the jury?

(15)    Does a trial court abuse its discretion by failing to grant a mistrial, when the jury states that it cannot reach a verdict and be fair to a litigant?

(16)    Does incompetent expert witness testimony support a jury's verdict?

(17)    In a trial de novo, must an independent determination be made on every issue?

(18)    Does conclusory evidence support a jury's verdict?

(19)    Can a lawyer lose his license for activity which he commits in his individual capacity?

(20)  Must a trial court enter findings of fact which demonstrate that it actually utilized its discretion?

(21)  Must a trial court enter findings of fact which are sufficient to permit meaningful review of its decision?

(22)  Can a trial court base a sanction on an opinion which it never read?

(23)  Does a litigant waive his right to attorney's fees if he fails to submit an issue to the jury?

(24)  Can [the] Commission for Lawyer Discipline obliterate an attorney's constitutional right to a jury by classifying an attorney's fees award as a sanction?

(25)  Can conclusory evidence support a trial court's award of appellate attorney's fees?

In an additional issue, Cantu also asserted that cumulative error warrants reversal or remand.[4] The Commission filed an appellee's brief, and Cantu filed a reply thereto.

The Texas Supreme Court has addressed Cantu's first seven issues and his tenth issue, all of which pertain to the admission of Judge Isgur's testimony and the admission into evidence of the redacted version of Judge Isgur's memorandum opinion denying Cantu a discharge in bankruptcy. *See Comm'n for Lawyer Discipline*, 587 S.W.3d at 787 ("In summary, the trial court did not abuse its discretion by permitting Judge Isgur to testify or by admitting Judge Isgur's redacted Opinion."). Considering both Judge Isgur's testimony and his memorandum opinion where relevant, we review Cantu's remaining issues.

---

[4] Cantu's twenty-sixth issue was not included in the "Issues Presented" portion of his brief as required by the appellate rules. *See* TEX. R. APP. P. 38.1(f). However, this issue was presented in the body of Cantu's brief and was appropriately supported by argument and authority. *See id.* R. 38.9 (requiring "substantial compliance" with the briefing rules); *Perry v. Cohen*, 272 S.W.3d 535, 587 (Tex. 2008) (directing courts to construe briefs "reasonably, yet liberally").

## II. STANDARD OF REVIEW

The violation of one disciplinary rule is sufficient to support a finding of professional misconduct. *Thawer v. Comm'n for Lawyer Discipline*, 523 S.W.3d 177, 187 (Tex. App.—Dallas 2017, no pet.); *Cluck v. Comm'n for Lawyer Discipline*, 214 S.W.3d 736, 739 (Tex. App.—Austin 2007, no pet.). A trial court has broad discretion to determine the consequences of professional misconduct. *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 659 (Tex. 1994) (per curiam); *Olsen v. Comm'n for Lawyer Discipline*, 347 S.W.3d 876, 888 (Tex. App.—Dallas 2011, pet. denied); *Butler v. Comm'n for Lawyer Discipline*, 928 S.W.2d 659, 666 (Tex. App.—Corpus Christi–Edinburg 1996, no writ); *Minnick v. State Bar of Tex.*, 790 S.W.2d 87, 92 (Tex. App.—Austin 1990, writ denied). Nevertheless, the judgment of a trial court in a disciplinary proceeding may be so light, or so heavy, as to constitute an abuse of discretion. *Kilpatrick*, 874 S.W.2d at 659; *Olsen*, 347 S.W.3d at 888.

We may not overrule the trial court's decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Olsen*, 347 S.W.3d at 888; *Landerman v. State Bar of Tex.*, 247 S.W.3d 426, 433 (Tex. App.—Dallas 2008, pet. denied); *Rodgers v. Comm'n for Lawyer Discipline*, 151 S.W.3d 602, 618 (Tex. App.—Fort Worth 2004, pet. denied); *Eureste v. Comm'n for Lawyer Discipline*, 76 S.W.3d 184, 202 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The mere fact that a trial court may decide a matter differently than an appellate court does not demonstrate an abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985).

Rule 3.10 of the Texas Rules of Disciplinary Procedure sets forth factors for trial courts to consider in determining the appropriate sanctions for misconduct. TEX. RULES DISCIPLINARY P. R. 3.10.A–L. These factors include the nature and degree of the professional misconduct, the seriousness of and circumstances surrounding the misconduct, the loss or damage to clients, the damage to the profession, the assurance that those who seek legal services in the future will be insulated from the type of misconduct found, the profit to the attorney, the avoidance of repetition, the deterrent effect on others, the maintenance of respect for the legal profession, the trial of the case, and other relevant evidence concerning the attorney's personal and professional background. *See id.*; *Kilpatrick*, 874 S.W.2d at 659 *Thawer*, 523 S.W.3d at 188; *Olsen*, 347 S.W.3d at 889.

### III. EXPERT TESTIMONY

In his eighth and ninth issues, Cantu argues that the trial court erred by allowing bankruptcy trustee Schmidt to testify as an expert witness for the Commission. Cantu contends that he challenged Schmidt's qualifications by *Daubert* motion and that at the *Daubert* hearing, the Commission presented evidence regarding Schmidt's experience in bankruptcy but "completely failed" to present evidence that Schmidt was qualified in "legal ethics" or in "divining truth from fiction" or that he possessed "expertise in fraud or unethical conduct." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90 (1993); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995). Cantu further argues that Schmidt's experience as an attorney failed to qualify him as an expert and that ultimately, Schmidt's testimony was not helpful because the "ultimate issues" in the case concerned "whether [Cantu] lied," and truthfulness is

41

within the common experience of juries. In contrast, the Commission argues that Cantu did not preserve his complaints about Schmidt's testimony and has waived these issues.

## A. Standard of Review

We review the trial court's decision to admit expert testimony for abuse of discretion. *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 422–23 (Tex. 2020). Texas Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. Rule 702 requires at least three predicates for the admission of expert testimony: the witness must be qualified; the opinion must be relevant; and the opinion must be based on a reliable foundation. *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018); *Robinson*, 923 S.W.2d at 556.

In deciding whether an expert is qualified, the trial court must ensure the proffered expert truly has expertise concerning the "actual subject about which they are offering an opinion." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex.1998)). The test is whether the expert has the "knowledge, skill, experience, training, or education" regarding the specific issue before the court which qualifies the expert to give an opinion on that subject. *In re Commitment of Bohannan*, 388 S.W.3d 296, 305 (Tex. 2012). The test mandates some flexibility. *Nabors Well Servs., Ltd. v. Romero*, 508 S.W.3d 512, 529 (Tex. App.—El Paso 2016, pet. denied). Stated otherwise, whether a proffered expert is qualified is not subject to a rigid formula. *Mega Child Care, Inc. v. Tex. Dept. of Protective & Regulatory Servs.*, 29 S.W.3d 303, 310 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

There must be, however, a "fit" between the subject matter and the expert's familiarity with that subject matter. *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). "The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the trial court which would qualify the expert to give an opinion on that particular subject." *Mega Child Care, Inc.*, 29 S.W.3d at 310.

"Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). Expert testimony is relevant if it is "sufficiently tied to the facts of the case" such that it will "aid the jury in resolving a factual dispute." *Robinson*, 923 S.W.2d at 556 (citations and quotations omitted). Expert testimony is reliable if it meets the six non-exclusive *Robinson* factors, *see id.* at 557, or if the trial court can otherwise assess its reliability. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). But "[i]f an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable." *Helena Chem. Co.*, 47 S.W.3d at 499.

## B. Background

Schmidt was not a retained expert, and the Commission had not asked him to form any specific opinion in connection with this case. Schmidt was subpoenaed to appear at the *Daubert* hearing. The Commission's designation of Schmidt as an expert provides:

> Mr. Schmidt was the Assigned Trustee in Cause no. 09-7018; *In Re: Mark A. Cantu, et al.*, In the United States Bankruptcy Court for the Southern District of Texas; McAllen Division. He is thus a fact witness with personal knowledge of numerous facts and circumstances of the bankruptcy and Respondent's conduct in connection with the bankruptcy. He has not been retained as an expert witness by Petitioner nor has he been asked to form specific opinions for purposes of testimony in this case. He is designated as an expert witness because of his expertise in matters related to bankruptcy and his knowledge, skill, training, education and experience as a bankruptcy attorney and trustee.

43

Mr. Schmidt may be called to testify regarding his personal knowledge as well as his professional opinions regarding Respondent's lack of compliance with obligations under the bankruptcy code, his opinions regarding the legal and factual conclusions drawn by Judge Isgur in his memorandum opinion, Respondent's lack of compliance with court orders in the bankruptcy case and the effect of Respondent's actions on the administration of the bankruptcy estate.

Thus, Schmidt was designated both for his expertise and his personal knowledge of the bankruptcy events. In response, Cantu alleged in his "Respondent's First Amended Objections to Petitioner's Experts" that Schmidt's testimony should be excluded:

8.     The court should exclude the testimony of PETITIONER's expert, MICHAEL B. SCHMIDT, on the subject of bankruptcy, for the following reasons:

   a.     The expert is not qualified to give an opinion on bankruptcy law because he does not have the education, training, specialized knowledge, skill, or experience to provide such an opinion. He is not board certified in any field and is does not meet the practice requirements for board certification in consumer or business bankruptcy.

   b.     The opinion of the expert on areas designated is not relevant. The Petitioner has designated this expert as follows: "He is designated as an expert witness because his personal knowledge is necessarily informed by his expertise in matters related to the bankruptcy and his knowledge, skill, training, education and experience as bankruptcy judge." The Petitioner's designation is so vague the Respondent has no idea what he will testify about. However, should he testify about the Respondent's violation of court order, lack of compliance with the bankruptcy code, etc., such testimony is irrelevant and improper. An expert cannot testify about his opinion on a question of law. *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 94 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *UpJohn Co. v. Rylander*, 38 S.W.3d 600, 611 (Tex. App.—Austin 2000, pet. denied). Opinions about whether someone has failed to comply with the bankruptcy code or with court orders is a question of law, and thus not proper testimony area for an expert witness.

c. In addition, should the expert provide opinions in line with the other Petitioner's Experts, "regarding the legal and factual conclusions drawn by Judge Isgur in his memorandum opinion []," said opinions are irrelevant and a needless presentation of cumulative evidence. The expert's opinion about Judge Isgur's rulings and factual conclusions is irrelevant. How can a person designated as an expert witness by the Petitioner, who is not board certified in bankruptcy law, and not qualified to serve as a bankruptcy expert, give an opinion as to a bankruptcy judge's conclusions in on Order? Not relevant.

d. The probative value of the expert's opinion is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403. The court should exclude the testimony of MICHAEL B. SCHMIDT on bankruptcy because the probative value of the expert's opinion is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. Tex. R. Evid. 403.

Petitioner's expert MICHAEL B. SCHMIDT is a Trustee for the United States bankruptcy court. In fact, MICHAEL B. SCHMIDT served, and continues to serve, as Trustee in the Respondent's underlying bankruptcy. As such, MICHAEL B. SCHMIDT has a fiduciary duty to the Respondent, Roxanne Cantu[,] and Mar-Rox, Inc. It would be a breach of MICHAEL B. SCHMIDT'S fiduciary duty to the bankruptcy estate of the Respondent, Roxanne Cantu[,] and Mar-Rox, Inc., to allow him to testify against the Respondent.

At the pretrial *Daubert* hearing, Cantu made two oral objections to Schmidt's testimony: (1) Schmidt was not board certified in bankruptcy law; and (2) Schmidt was a biased witness who was prejudiced against Cantu because Cantu had sued Schmidt four times and because they had an adversarial relationship during the bankruptcy proceeding. On the record, the trial court ruled as follows:

I don't think there's anything that suggests, unless Mr. Rayfield wants to produce it, that somebody has to be board certified to be qualified as an expert, and although I do hear the concern of Mr. Rayfield, I don't think there's anything outlined in 702 that precludes Mr. Schmidt from taking the stand.

45

I believe that he has shown himself through Petitioner's Exhibit 1 and his testimony to be qualified to testify. He obviously has more knowledge than your typical juror, and I believe would assist the jury, or the trier of fact.

I think that the issues raised by Mr. Rayfield in this hearing go to the weight of his testimony and not the admissibility of his testimony.

That same day, the trial court signed a written order that overruled Cantu's objections to Schmidt.[5]

## C.    Analysis

In summary, in his *Daubert* motion, Cantu objected to Schmidt's service as an expert on grounds that he was not qualified to testify about bankruptcy law, his opinions were irrelevant, his opinions would be cumulative, the probative value of Schmidt's opinions was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence; and it would be a breach of fiduciary duty for Schmidt to testify because he served as trustee for the bankruptcy estate of Roxanne Cantu and Mar-Rox. And, at the *Daubert* hearing, Cantu further argued that Schmidt was not qualified to testify as an expert because he was not board certified in bankruptcy law and he was biased against Cantu.

### 1.    Qualifications

We first address Cantu's complaints that Schmidt was not qualified to testify as an expert. At the hearing, Schmidt testified that he had been an attorney for more than forty

---

[5] The trial court previously issued a separate order on expert testimony; however, the trial court held its rulings on Schmidt and Judge Isgur in abeyance. The trial court's order overruling Cantu's objections to Schmidt states that it is a ruling on Cantu's "Second Amended Objections" to the Commission's experts; however, this document is not in the record before us. Both Cantu and the Commission refer to Cantu's "First Amended Objections" in their briefing, and we do likewise.

years, had been practicing bankruptcy law since 1990, had served as a bankruptcy trustee since 1999, and was an expert in bankruptcy law. He had been involved in approximately 5,000 to 6,000 bankruptcy cases. He testified that he was "very familiar" with bankruptcy law and procedure both as a practitioner and as a trustee, and he dealt with the rules and code provisions "every workday." He explained that he had served as a speaker on bankruptcy on a number of occasions in South Texas and international legal education seminars, and "regularly" testified in bankruptcy court about bankruptcy code provisions and their application. Schmidt testified that he had often served as an expert witness and that he believed that he had more information regarding bankruptcy law and procedure as a result of his knowledge, skill, training, education, and experience than the average juror would have. Schmidt further testified that he was personally familiar with the bankruptcy proceedings involving Cantu.[6] He testified that he had reviewed Judge Isgur's memorandum opinion denying Cantu's discharge and believed that he had knowledge that would help the jurors understand the terms, definitions, fact findings, and statements of law used in that opinion.

We conclude that Schmidt was qualified as an expert by his specialized knowledge and extensive experience in bankruptcy. *See Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002). Nothing in Rule 702 requires an expert witness to be board certified in a particular area of law in order to offer an expert opinion. *Cf. Cura-Cruz v. CenterPoint Energy Houston Elec., LLC*, 522 S.W.3d 565, 573 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("Neither a particular college degree nor a particular license is

---

[6] Schmidt's resume was offered into evidence at the *Daubert* hearing "for purposes of the hearing" and was admitted into evidence over Cantu's objection. Nevertheless, it does not appear to have been included in the exhibits to the reporter's record.

required under Rule 702 for a witness to qualify as an expert."). Instead, Rule 702 demands that the trial court examine the proffered witness's "knowledge, skill, experience, training, or education." *See* TEX. R. EVID. 702. We overrule Cantu's argument otherwise.

### 2. Relevance

Cantu alleged that Schmidt's opinions regarding whether Cantu violated court orders or failed to comply with the bankruptcy code were irrelevant and improper and that an "expert cannot testify about his opinion on a question of law." Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Id.* R. 401. "Relevant evidence is presumed to be admissible." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018); *see* TEX. R. EVID. 402.

At trial, the Commission utilized Schmidt, who served as the trustee for Cantu's Chapter 7 bankruptcy proceedings, to aid the jury in understanding the evidence by providing a background and understanding of bankruptcy law and the proceedings which take place during bankruptcy. Schmidt further testified regarding his personal knowledge of Cantu's actions that gave rise to the underlying proceeding. We conclude that Schmidt's testimony was relevant. *See* TEX. R. EVID. 401.

We agree with Cantu's contention that an expert witness may not testify to his opinion on pure questions of law. *Pressil v. Gibson*, 477 S.W.3d 402, 411 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 94 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Mega Child Care, Inc.*, 29 S.W.3d at 309; *Ledbetter v. Mo. Pac. R. Co.*, 12 S.W.3d 139, 144 (Tex. App.—Tyler 1999,

pet. denied). An expert may, however, state an opinion on a mixed question of law and fact if the opinion is limited to the relevant issues and is based on proper legal concepts. *Greenberg Traurig*, 161 S.W.3d at 94*; see GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 619–20 (Tex. 1999); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987). An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Greenberg Traurig*, 161 S.W.3d at 94; *Mega Child Care, Inc.*, 29 S.W.3d at 309. "Thus, an expert is not allowed to testify directly to his understanding of the law but may only apply legal terms to his understanding of the factual matters in issue." *Greenberg Traurig*, 161 S.W.3d at 94; *see Welder v. Welder*, 794 S.W.2d 420, 433 (Tex. App.—Corpus Christi–Edinburg 1990, no writ)). Where the trier of fact is equally competent to form an opinion regarding an issue of ultimate fact, the expert's testimony on those issues may be excluded. *Mega Child Care, Inc.*, 29 S.W.3d at 309.

These distinctions can be challenging to apply on a case-by-case basis. As explained by one of our sister courts of appeals in a legal malpractice case:

> An expert must testify before the jury has received the jury charge and before it has been instructed on specific elements and standards concerning specific claims. The lawyers, the expert, and the judge begin trial with knowledge of the generally applicable duties and their potential scope; the jurors do not. In order for an expert to meaningfully "apply legal terms to his understanding of the factual matters in issue" in a way that assists the jury, *see Greenberg Traurig*, 161 S.W.3d at 94, the expert must have some leeway to reference the controlling "legal terms" and related concepts while testifying. Otherwise, a jury would not be able to make sense of the expert's testimony or measure it against the charge's requirements, and the sponsoring litigant could not meet a motion for directed verdict.

> It follows that the standards governing admission of expert testimony do not automatically foreclose every reference to legal terms or the disciplinary rules in the course of expert testimony addressing an attorney's alleged breaches of the duties owed to a client. *See Piro v. Sarofim*, 80 S.W.3d 717,

720 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Such an expert properly may include these references when the trial court sets appropriate limits. *See id.* The continuum of potentially relevant testimony from an expert likely will vary according to the specific facts and the specific legal standards being litigated in specific cases.

*Fleming v. Kinney ex rel. Shelton*, 395 S.W.3d 917, 928–29 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (concluding that the expert permissibly testified regarding "general fiduciary duty concepts" and that the attorney violated "the applicable duties" regarding expenses but reversing and remanding because some expert testimony ran "afoul of the reliability requirement" insofar as it misstated the applicable law and violated the prohibition "against testimony concerning pure questions of law.").[7]

We conclude that the trial court did not err in allowing Schmidt to testify to the extent that his testimony comprised mixed questions of fact and law. In short, he applied legal terms to his understanding of the factual matters in issue. *See id.*; *Greenberg Traurig*, 161 S.W.3d at 94; *Welder*, 794 S.W.2d at 433. And, given that the liability issues were submitted to a jury, and the jury was not equally competent in bankruptcy matters, Schmidt's testimony was admissible. *See Mega Child Care, Inc.*, 29 S.W.3d at 309. His testimony did not cross the lines established against pure questions of law and did not run afoul of the reliability requirement. *Fleming*, 395 S.W.3d at 928–29.

---

[7] We note that these doctrines may have limited applicability in bench trials regarding attorney misconduct. *See Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 73–74 (Tex. App.—Houston [14th Dist.] 2016, no pet.). In *Bennett*, the Houston Court of Appeals concluded that the trial court did not abuse its discretion when it prohibited Bennett's legal experts from testifying regarding the legal construction of the Texas Disciplinary Rules of Professional Conduct because an opinion on the proper construction of those rules is an opinion on a pure question of law. *Id.* The court similarly concluded that the trial court did not abuse its discretion when it prevented Bennett's experts from testifying on a mixed question of law and fact regarding whether Bennett's conduct violated the rules because the trial judge, "presumed to have specialized competency in all areas of the law and a legal expert herself, 'was perfectly capable of applying the law to the facts and reaching a conclusion without benefit of expert testimony from another attorney.'" *Id.* (quoting *Holden v. Weidenfeller*, 929 S.W.2d 124, 134 (Tex. App.—San Antonio 1996, writ denied)).

Further, even if we were to presume that the trial court erred in allowing some of Schmidt's testimony, the error would be reversible only if it probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1). In determining whether evidentiary error resulted in an improper judgment, we review the entire record, considering the state of the evidence, the strength and weakness of the case, and the verdict. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015); *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008). If the erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful, but if it was cumulative of other evidence, or if the evidence was so one-sided that the error probably made no difference, then the error was likely harmless. *JLG Trucking, LLC*, 466 S.W.3d 165; *Reliance Steel & Aluminum Co.*, 267 S.W.3d at 873. Here, Schmidt's testimony was cumulative of other evidence, and the error, if any probably made no difference in the verdict given the totality of the evidence, including testimony from Cantu himself.

### 3. Cumulative

Cantu objected that Schmidt's testimony would be cumulative of that presented by Judge Isgur. Rule 403 states that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 883 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Thus, to determine whether evidence should be excluded under Rule 403, we balance the probative value of the evidence against the countervailing concerns listed in Rule 403. *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 542 (Tex. 2018). "Rule 403 favors admission by

requiring these countervailing concerns to substantially outweigh the evidence's probative value before it may be excluded." *Id.*

Thus, a trial court has authority to prevent the needless presentation of cumulative evidence under Texas Rule of Evidence 403. *See* TEX. R. EVID. 403. However, the mere fact that another witness may give the same or substantially the same testimony is not the decisive factor because "[l]itigants often have a legitimate need to offer similar evidence from different witnesses." *Hooper v. Chittaluru*, 222 S.W.3d 103, 110 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). As an example, "testimony from a disinterested witness may lend substantial weight to similar testimony from an interested witness, particularly on a hotly-contested issue." *Id.*; *see In re N.R.C.*, 94 S.W.3d 799, 807 (Tex. App.—Houston [14th Dist.] 2002, pet. denied); *Sims v. Brackett*, 885 S.W.2d 450, 454 (Tex. App.—Corpus Christi–Edinburg 1994, writ denied); *Bohmfalk v. Linwood*, 742 S.W.2d 518 (Tex. App.—Dallas 1987, no writ). We thus examine whether the evidence that is alleged to be cumulative is similar and whether it adds substantial weight to the offering party's case. *See Hooper*, 222 S.W.3d at 110; *Benavides*, 189 S.W.3d at 884.

We acknowledge that portions of Schmidt and Judge Isgur's testimony were similar in some respects insofar as both testified to their observations and conclusions regarding Cantu's actions during the bankruptcy proceedings. Nevertheless, both witnesses offered disparate testimony. Schmidt offered information about bankruptcy proceedings in general and provided specific testimony about Cantu's bankruptcy case and its evolution from a Chapter 11 reorganization to a Chapter 7 liquidation. In contrast, Judge Isgur offered an overview of the adversarial proceedings within the bankruptcy. Further, even

if their testimony was identical, other factors render it non-cumulative. Schmidt and Judge Isgur testified from different perspectives on the case. Schmidt occupied an adversarial position to Cantu, whereas, as a fact witness, Judge Isgur's testimony would have added substantial weight to the Commission's case and thus was not cumulative. *See Benavides*, 189 S.W.3d at 883–84 (concluding that two experts with similar testimony were not cumulative because their qualifications were different and one was called adversely by the plaintiff); *Sims*, 885 S.W.2d at 454 ("The difference in the two expert's [sic] credentials and [the first expert]'s lack of a personal relationship with [the plaintiff] in all likelihood would have enhanced [the first expert]'s credibility compared to [the second expert]'s.").

### 4. Probative Value

In his *Daubert* motion, Cantu objected that the probative value of Schmidt's expert opinion was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403. However, Cantu did not present argument or authority regarding any of these issues other than the allegedly cumulative nature of Schmidt's testimony, which we have previously addressed, and he does not otherwise address this contention on appeal. *See* TEX. R. APP. P. 38.1(i). Accordingly, we reject this argument.

### 5. Fiduciary Duty

Cantu objected to Schmidt on grounds that allowing him to serve as an expert witness for the Commission would breach Schmidt's fiduciary duty to Roxanne Cantu and Mar-Rox because Schmidt was the trustee for Cantu's underlying bankruptcy

53

proceedings. Cantu offered no argument or authority in favor of this allegation and does not present it on appeal. Thus, we reject this basis for excluding Schmidt's testimony.[8]

**6.     Bias**

Next, Cantu objected to Schmidt's service as an expert witness on grounds that Schmidt was allegedly biased against him. Cantu argued that Schmidt's "bias or prejudice" was "so extreme" that he could not be allowed to testify as an expert witness. At the *Daubert* hearing, Cantu's counsel cross-examined Schmidt regarding alleged bias, and Schmidt denied that he was prejudiced against Cantu. Schmidt testified that he "was not predisposed" against Cantu until during the trial and after the bankruptcy cases were tried and "the facts arose and were proven." He admitted filing the motion to deny Cantu a bankruptcy discharge. Schmidt stated that his conclusions regarding Cantu's false oaths and other violations were "conclusion[s] based on facts and law." Schmidt testified that he held these opinions regarding Cantu before Judge Isgur wrote his memorandum opinion regarding Cantu. Schmidt acknowledged that Cantu had sued him "about four times."

"Bias, in its usual meaning, is an inclination toward one side of an issue rather than to the other . . . ." *Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963). Proof of bias on the part of an expert witness may be offered to impeach the expert's credibility. *See* TEX. R. EVID. 613(b); *In re Siroosian*, 449 S.W.3d 920, 923 (Tex. App.—Fort Worth 2014, orig. proceeding); *In re Plains Mktg., L.P.,* 195 S.W.3d 780, 782 (Tex. App.—Beaumont 2006,

---

[8] In this regard, we note that Cantu's expert witness, Stephen Sather, testified that a bankruptcy trustee is "an independent fiduciary appointed to administer a bankruptcy case and to liquidate assets and make payments to creditors." Sather expressly testified that there is not a fiduciary relationship between the trustee and the debtor but instead there is a fiduciary relationship between the trustee and the creditors. Sather testified that the trustee can also be a fiduciary to the debtor in a surplus asset case, but Cantu's bankruptcy was not such a surplus asset case.

orig. proceeding); *In re Weir*, 166 S.W.3d 861, 864 (Tex. App.—Beaumont 2005, orig. proceeding). Thus, in short, the potential bias of Schmidt is a credibility issue, not an admissibility issue. *See, e.g.*, *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 630 (Tex. 1996) (orig. proceeding) (noting that the allegation of bias tests the witness's credibility and allows the jury to determine the weight of the witness's testimony).

### 7.     Ethics and Truthfulness

On appeal, Cantu contends that the trial court erred in allowing Schmidt to testify regarding "legal ethics," "divining truth from fiction," and "fraud or unethical conduct." Cantu further argues that Schmidt's testimony was not helpful to the jury because the "ultimate issues" in the case concerned "whether [Cantu] lied," and truthfulness is within the common experience of juries.[9]

Based on our review of the record, these complaints on appeal do not comport with Cantu's objections at trial, and thus these issues are not preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Jardon v. Pfister*, 593 S.W.3d 810, 831 (Tex. App.—El Paso 2019, no pet. h.); *Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687, 728 (Tex. App.—Eastland 2019, pet. denied); *In re N.T.*, 335 S.W.3d 660, 670 (Tex. App.—El Paso 2011, no pet.).[10] Cantu has not preserved error regarding these arguments.

---

[9] We note that Cantu's counsel routinely queried his experts regarding whether Cantu made "misrepresentations" or did anything "dishonest," "deceitful," or "fraudulent." In fact, Bill Piatt testified that "My opinion is that Mark Cantu did nothing unethical in the handling of the bankruptcy case."

[10] When a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court can conduct this analysis. However, when the challenge is restricted to the face of the record—for example, when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. *See Pike v. Tex. EMC Mgmt., LLC*, No. 17-0557, 2020 WL 3405812, at *17, __ S.W.3d __, __ (Tex. June 19, 2020); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004).

We overrule Cantu's eighth and ninth issues.

## IV. CHARGE ERROR

Cantu alleges error in the jury charge in issues eleven through fourteen. Specifically, Cantu alleges that he is entitled to a new trial because the trial court failed to submit an affirmative defense (issue eleven); Cantu's good faith constitutes a defense to the disciplinary proceeding (issue twelve); the commentaries to the rules of professional conduct provide necessary content to their construction (issue thirteen); and a conditional submission deprived him of a fair determination by the jury (issue fourteen). The Commission asserts that Cantu has failed to preserve error regarding these issues.

## A. Applicable Law

A trial court must submit jury questions, instructions, and definitions that are raised by the written pleadings and the evidence. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017); *see* TEX. R. CIV. P. 278; *see also Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999). In reviewing alleged error in a jury submission, we consider "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) (citing *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 843 (Tex. 2005); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986)). The alleged charge error "will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *Island Recreational*, 710 S.W.2d at 555;

56

*see United Scaffolding, Inc.*, 537 S.W.3d at 469; *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex. 1995).

A trial court's decision to submit or refuse a specific instruction in a jury charge is reviewed for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). The trial court has considerable discretion to determine proper instructions, and if an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper. *Id.* An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Id.* An appellate court will not reverse a judgment for a charge error unless that error was harmful because it probably caused the rendition of an improper judgment or probably prevented the petition from properly presenting the case to the appellate courts. *Id.* Charge error is generally considered harmful if it relates to a contested, critical issue. *Id.*

## B.    Instruction on Good Faith

Cantu's eleventh, twelfth, and thirteenth issues relate to question six of the charge in this case, which asked jurors: "Do you find [Cantu] engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation?" Cantu requested that the trial court submit an instruction as an affirmative defense based on a comment to Rule 8.04 of the Texas Disciplinary Rules for Professional Conduct. TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 8.04 cmt. The comment states that "[a] lawyer may refuse to comply with an obligation imposed by law upon a good faith belief, openly asserted, that no valid obligation exists." *Id.*

At the charge conference, Cantu argued that the comment to Rule 804 was an affirmative defense, and he requested that it be submitted as an instruction for question number six dealing with Rule 804(a)(3). He asserted that there were "six" or "seven' different comments and "number 6" says good faith. He requested the instruction to be submitted to the jury "either in a preamble or below that question." The Commission objected because Cantu had not pleaded good faith as an affirmative defense and had no proof of that alleged defense. The Commission argued that the issue of good faith had not been developed through discovery and evidence. Cantu clarified he was not seeking submission of an issue or question and asserted that the commentaries to the Rules have the "same full force and effect as the rules do, and the jury should know what they are." The court denied Cantu's request.

Under the rules of civil procedure, the "[f]ailure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." TEX. R. CIV. P. 278; *see Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 159 (Tex. App.—San Antonio 2008, pet. denied). This rule has been "strictly applied," and "[d]ictating the request to the court reporter in the presence of the court and opposing counsel is sufficient to register an objection, but it is not sufficient to support an appeal based on the trial court's refusal to submit requested material." *Hartnett v. Hampton Inns, Inc.*, 870 S.W.2d 162, 165 (Tex. App.—San Antonio 1993, writ denied).

Cantu did not submit his requested instruction in writing. He nevertheless argues that he has preserved error because the trial court was aware of his complaint and issued a ruling. He argues that the Texas Supreme Court has held that "[t]here should be but

58

one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). "The more specific requirements of the rules should be applied, while they remain, to serve rather than defeat this principle." *Id.*; *see also First Bank v. Brumitt*, 519 S.W.3d 95, 106 n.11 (Tex. 2017); *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 474 (Tex. 2004).

Prior to *Payne*, the Texas Supreme Court expressly addressed the propriety of dictating a request on the record and determined that this procedure failed to meet the requirements of Rule 278. *See Woods v. Crane Carrier Co.*, 693 S.W.2d 377, 379 (Tex. 1985). Following *Payne*, this Court examined whether the refusal to submit a requested instruction was governed by *Payne*'s general preservation-of-error rule. *See Gilgon, Inc. v. Hart*, 893 S.W.2d 562, 565–66 (Tex. App.—Corpus Christi–Edinburg 1994, writ denied). We rejected the argument that *Payne* presents the sole test for preservation of error. *See id.* We held that we apply *Payne* and the additional requirements of Rule 278—that the party complaining of the judgment must have presented a written request that the omitted definition or instruction be included in the charge and must have also tendered the proposed definition or instruction in substantially correct wording. *See id.*; *see also Nat. Soda LLC v. Bunnett & Co., Inc.*, No. 13-17-00558-CV, 2020 WL 1951454, at *19 (Tex. App.—Corpus Christi–Edinburg Apr. 23, 2020, no pet. h.) (mem. op.) (concluding that error was waived by failing to submit a written request to include qualifying or limiting language to an instruction).

59

Most of the courts that have addressed this issue following *Payne* have similarly held that an oral request does not preserve error for the failure to provide a requested instruction. *See*, *e.g.*, *In re F.L.R.*, 293 S.W.3d 278, 281–82 (Tex. App.—Waco 2009, no pet.) (collecting cases); *In re A.R.*, 236 S.W.3d 460, 479 (Tex. App.—Dallas 2007, no pet.) (stating that when the court omits an instruction or definition, a party must make the request in writing or any error is not preserved for review); *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 603 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (stating that requested instructions must be submitted in writing to preserve error); *Fairfield Estates L.P. v. Griffin*, 986 S.W.2d 719, 724 (Tex. App.—Eastland 1999, no pet.) ("Because defendants' request was not made 'in writing,' it was waived."); *Jarrin v. Sam White Oldsmobile Co.*, 929 S.W.2d 21, 25 (Tex. App.—Houston [1st Dist.] 1996, writ denied) ("Dictating a requested instruction to the court reporter is not sufficient to support an appeal based on the trial court's refusal to submit requested material."); *Hartnett*, 870 S.W.2d at 165 (providing that oral requests are insufficient to support an appeal based on the trial court's refusal to submit requested material); *see also Sec. Nat. Ins. Co. v. Murrell*, No. 02-11-00155-CV, 2012 WL 3115733, at *4 (Tex. App.—Fort Worth Aug. 2, 2012, pet. denied) (mem. op.) ("Because Security National did not present a proposed correct definition in writing, it waived the error, if any, in the trial court's failure to instruct the jury on the rebuttable presumption regarding intoxication."); *Yzaguirre v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, No. 04-09-00550-CV, 2010 WL 1404620, at *1 (Tex. App.—San Antonio Apr. 7, 2010, no pet.) (mem. op.) ("Merely dictating a requested instruction to the court reporter is not sufficient to support an appeal based on the trial court's refusal to submit the instruction."); *Laas v. State Farm Mut. Auto. Ins. Co.*, No. 14–

98–00488–CV, 2000 WL 1125287, at *12 (Tex. App.—Houston [14th Dist.] Aug. 10, 2000, pet. denied) (mem. op.) (stating that Rule 278 mandates the way in which requested issues shall be made, and "merely dictating a requested issue into the record is not sufficient"). *But see Ft. Worth Indep. Sch. Dist. v. Palazzolo*, 498 S.W.3d 674, 679–80 (Tex. App.—Fort Worth 2016, pet. denied) (concluding that error was not waived for the trial court's refusal to submit a question despite the proponent's failure to tender a written request because the proponent's proposed jury charge and its written and oral objections to the charge identified the alleged error); *In re M.P.*, 126 S.W.3d 228, 231 (Tex. App.—San Antonio 2003, no pet.) (concluding that error was not waived despite the failure to submit a written request where "counsel made the trial court aware of his request, timely and plainly, with his oral dictation in the record of his exact request and with his repeated objection after closing arguments" under the "common sense *Payne* approach").

Even if we were to depart from the plain language of Rule 278 and our own precedent and conclude that a written submission was not required to preserve error, we would be unable to apply that doctrine in this instance. First, Cantu has taken apparently conflicting positions regarding whether he was requesting the trial court to submit the "good faith" affirmative defense to the jury as a question or an instruction. In his brief and reply brief, Cantu alleges that he argued that good faith could be submitted to the jury as an instruction or a proposed question. The record shows that Cantu's counsel used the following terminology during the charge conference: "the jury should be instructed," "[w]e believe it's proper as an instruction; "[w]e're not asking that it be submitted as an issue—as a question," "[a]n instruction to the jury is what we're asking." Cantu's counsel even argued to the trial court that her stated concerns regarding the submission would be

61

reasonable if he were submitting a jury question rather than an instruction. Second, the parties inconsistently refer to both questions five and six of the charge for placement of the instruction, and it is thus somewhat unclear regarding how Cantu anticipated utilizing the instruction. Finally, the parties refer to the relevant commentary from which the "good faith" defense originated as comment number six to Rule 8.04, but based on our reading of Rule 8.04, the Rule lacks six comments. The "good faith" defense appears to be incorporated in the four comments to the Rule as comment number three. Under these circumstances, we cannot say that Cantu clearly made the trial court aware of his request, timely and plainly, with his oral dictation in the record of his exact request and with any repeated objections, so as to fall within the minority view regarding preservation of error. *See Ft. Worth Indep. Sch. Dist.*, 498 S.W.3d at 679–80; *In re M.P.*, 126 S.W.3d at 231.

We overrule Cantu's eleventh and twelfth issues. Having done so, we need not address Cantu's thirteenth issue pertaining to the legal effect of the commentaries to the Rules. *See* TEX. R. APP. P. 47.4.

## B.     Conditional Submission

In his fourteenth issue, Cantu alleges that a conditional submission in the charge deprived him of a fair determination by the jury. Question number six, which asked "Do you find [Cantu] engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation," instructed the jurors to "answer 'yes' or 'no'" with regard to "Question No. 2" rather than "Question No. 6." Cantu thus alleges that the answer to Question No. 6 was "tied" to Question No. 2 and the jury was essentially "instructed that it should provide the same answer" to both questions.

62

Cantu did not object to this error at trial.[11] Parties must make all objections to the charge "before the charge is read to the jury." TEX. R. CIV. P. 272; *King Fisher Marine Serv. v. Tamez*, 443 S.W.3d 838, 843 (Tex. 2014); *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 830 (Tex. 2012). Objections to errors in the charge are waived if made after the charge is read. *King Fisher Marine Serv.*, 443 S.W.3d at 843 (stating that Rule 272 "strictly prohibits objections after the charge is read"); *see also Wheelbarger v. Landing Council of Co–Owners*, 471 S.W.3d 875, 897–98 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627 (Tex. App.—Dallas 2004, pet. denied). We overrule Cantu's fourteenth issue.

## V. JURY DELIBERATIONS

By his fifteenth issue, Cantu asserts that the trial court abused its discretion by failing to grant a mistrial when the jury informed the trial court that they were deadlocked. The Commission, in contrast, contends that the trial court had no authority to grant a motion for mistrial "because circumstances did not indicate that it was altogether improbable that the jury could agree on a verdict."

Based on the record, it appears that the trial court signed the jury charge on March 8, 2016 at 3:16 p.m., and the jury began deliberations thereafter. The trial court excused the jury at 5:30 p.m. The jury resumed deliberations at approximately 8:30 a.m. on March 9, 2016. During the course of that day, the jurors sent several notes out from their deliberations with various questions which were answered by the judge. That afternoon, at 4:30 p.m., the jury sent a note that stated: "We, the jury, have not been able to reach

---

[11] We note that the charge contained several typographical errors. For instance, the judge corrected "residing juror" to read "presiding juror"; "juror" was corrected to read "jurors"; the charge duplicated the phrase "With regard to" in Question No. 6; and the jurors queried the word "exits" on Question No. 5 which should have read "exists."

63

a decision of at least ten out of [twelve] on any of the questions and we are in a position to where all have decided their own decision [sic]." The note was signed by the presiding juror. The trial court instructed the jurors to "Please continue your deliberations." At 6:08 p.m., the jury sent another note stating that "Ten out twelve jurors <u>still</u> cannot come to an agreement. We feel that we all cannot come to make a fair decision."

Cantu orally moved for a mistrial on grounds that the jurors were unable to reach a fair decision. The trial court denied Cantu's motion for mistrial and again instructed the jurors to "Please continue your deliberations." The jurors reached their verdict at 8:18 p.m. that evening. Ten of twelve jurors agreed on the verdict.

Texas Rule of Civil Procedure 289 governs the discharge of a jury and provides:

The jury to whom a case has been submitted may be discharged by the court when they cannot agree and the parties consent to their discharge, or when they have been kept together for such time as to render it altogether improbable that they can agree, or when any calamity or accident may, in the opinion of the court, require it, or when by sickness or other cause their number is reduced below the number constituting the jury in such court.

The cause shall again be placed on the jury docket and shall again be set for trial as the court directs.

TEX. R. CIV. P. 289. "The length of time the jury is to be held in effort to secure an agreement is left to the sound discretion of the trial judge." *Shaw v. Greater Houston Transp. Co.*, 791 S.W.2d 204, 205–06 (Tex. App.—Corpus Christi–Edinburg 1990, no writ). "A trial court must have considerable latitude, short of genuine prejudice to a party." *Id.* "There must be substantial evidence to suggest that it was altogether improbable that the jury would reach a verdict." *Id.*

Nothing in this record shows that the trial court abused its discretion by instructing the jury to continue its deliberations. The jury ultimately reached its verdict on the first full

day of deliberations. *See Conrey v. McGehee*, 473 S.W.2d 617, 620 (Tex. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.) (concluding that no abuse of discretion was shown when the jury deliberated less than seven hours). The instructions that the trial court sent to the jury merely requested that the jurors continue to deliberate and were not coercive in nature. The jury's notes did not indicate that the jurors could not comply with the court's instructions. Aside from one conclusory statement in his brief, Cantu does not put forth any "substantial evidence" to suggest that it was "altogether improbable" that the jury would have reached a verdict in this case. *See Shaw*, 791 S.W.2d at 205–06. We conclude that the trial court did not abuse its discretion in refusing to discharge the jury. We overrule Cantu's fifteenth issue.

## VI. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

Cantu asserts that the evidence is legally and factually insufficient to support the verdict in his sixteenth through eighteenth issues. The jury found in the affirmative that Cantu: (1) took positions that unreasonably increased the costs or other burdens of the case; (2) knowingly made a false statement of material fact to a tribunal; (3) knowingly offered or used evidence he knew to be false; (4) disobeyed an obligation under the standing rules of or a ruling by a tribunal; and (5) engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation.

A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d

65

802, 819 (Tex. 2005). In a legal sufficiency review, we must view the evidence in the light most favorable to the verdict. *See Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (per curiam); *City of Keller*, 168 S.W.3d at 822.

When reviewing a verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 175 (Tex. 1986) (per curiam); *see Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex. 1985). The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict. *In re King's Estate,* 244 S.W.2d 660, 661 (Tex. 1951) (per curiam).

## A.    Expert Testimony

In his sixteenth issue, Cantu asserts that incompetent expert witness testimony cannot support a jury's verdict. In support of this issue, he argues that Judge Isgur and Schmidt were incompetent to testify. The supreme court has resolved this issue as it pertains to Judge Isgur against Cantu, *see Comm'n for Lawyer Discipline*, 587 S.W.3d at 780, and we have already determined that Schmidt's expert testimony was properly admitted. *See Guadalupe-Blanco River Auth.*, 77 S.W.3d at 807; *Cura-Cruz*, 522 S.W.3d at 573. Accordingly, we overrule Cantu's sixteenth issue.

## B.    De Novo Review

In his seventeenth issue, Cantu asserts that no evidence supports the verdict because he was entitled to a de novo review which required the jury to make an independent determination on every issue that was submitted to it. Cantu argues that under such a de novo review, the "Commission was required to independently prove each

act occurred, and then prove such act constituted a violation of the disciplinary rules, all without resort[ing] to the prior proceeding." In support of this issue, Cantu argues that, for instance, if the Commission desired to prove a violation of Texas Disciplinary Rules of Professional Conduct § 3.03(a)(1), regarding the false statement of fact to a tribunal, the Commission needed to prove (1) the precise statement was made, (2) to a tribunal, (3) the statement was of fact, and (4) how the statement was false. Cantu asserts that the Commission could not evade this burden by presenting Judge Isgur's testimony that he concluded that Cantu made a false statement because the jury must separately determine each fact.

The record does not support Cantu's argument. The parties made opening statements, introduced witness testimony and documentary evidence, performed cross-examination, and submitted the liability issues to a jury. The evidence submitted to the jury was not limited to Judge Isgur's testimony and opinion. The jury rendered its verdict on the evidence. The trial court assessed punishment accordingly. We overrule Cantu's seventeenth issue.

## C.    Conclusory Evidence

In his eighteenth issue, Cantu asserts that conclusory evidence will not support the jury's verdict. In support of this issue, Cantu argues that the evidence supporting the jury's responses to the questions in the charge "never went beyond the conclusory stage." Cantu attacks each of the jury's findings on this basis. With regard to the jury's conclusion that Cantu unreasonably increased the costs or other burdens of the case (Question Number One), Cantu asserts that Schmidt's testimony failed to include the number of related appeals, an explanation regarding why the appeals were frivolous, the docket

sheet evidencing 2,500 entries, and a "billing statement or profit and loss statement, concretely demonstrating the amount the alleged frivolous matters cost."

Regarding the jury's finding that Cantu knowingly made a false statement of material fact to a tribunal (Question Number Two); Cantu contends that "the specific false statements were generally not identified" at trial. He asserts that the only evidence in this regard were disputed statements concerning the existence of a temporary restraining order, and the omission of assets on the bankruptcy schedules, and no evidence was presented that either were submitted "to a tribunal."

With regard to the jury's finding that Cantu "knowingly offered or used evidence that he knew to be false," (Question Number Three) Cantu alleged that "[n]o evidence was presented of fraudulent evidence being tendered into evidence at Attorney's discharge" and "the only evidence presented were general statements concerning [Cantu's] lack of candor." However, Cantu argues that the precise false evidence was never identified.

Cantu does not brief or address the jury's findings with regard to Question Number Four that he "knowingly disobeyed an obligation under the standing rules of or a ruling by a tribunal" or Question Number Five that his conduct as referenced in Question Number Four "was an open refusal based either on an assertion that no valid obligation exits [sic] or on [Cantu's] willingness to accept any sanctions arising from such disobedience.

Regarding the jury's final finding in response to Question Number Six, that Cantu "engaged in conduct involving dishonesty, fraud, deceit or misrepresentation," Cantu asserts that neither Judge Isgur not Schmidt identified any specific lies or misrepresentations.

68

We review the legal and factual sufficiency of the evidence to support the jury's findings. *See City of Keller,* 168 S.W.3d at 819; *Cain*, 709 S.W.2d at 175. We examine the witnesses' testimony and the evidence adduced at trial. As stated previously, the jury found that Cantu: (1) had taken a position that unreasonably increased the costs or other burdens of the case during litigation; (2) had knowingly made a false statement of material fact to a tribunal; (3) had knowingly offered or used evidence that he knew to be false; (4) had "knowingly disobeyed an obligation under the standing rules of or a ruling by a tribunal," and that conduct was an open refusal based either on an assertion that no valid obligation existed or on a willingness to accept any sanctions arising from such disobedience; and (5) had engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. Based upon our review of the record, we conclude that the jury had before it legally and factually sufficient evidence to support its conclusions.

In terms of costs and burdens, Judge Schmidt's November 20, 2009 order concluded that Cantu had "engaged in conduct that [has] unnecessarily multiplied the proceedings in these Cases and therefore unreasonably increased the Estate's cost of administration." Judge Isgur also testified that Cantu's actions in his court "were the most litigious" that he had ever seen in an individual bankruptcy case and such actions "would have dramatically driven up the expenses in the case." Judge Isgur testified that because Cantu repeatedly failed to comply with court orders, the bankruptcy court was required to hold enforcement hearings, which ultimately drove up legal costs. Likewise, Schmidt testified that each time he had to hire counsel for the bankruptcy estate or act as an advocate for the estate as trustee, it cost the estate additional administrative costs. Cantu agreed that his actions "had some increase in costs" to the bankruptcy estate. Sather

69

testified that Cantu did not take any positions that "unreasonably" increased the burdens of the case but conceded that litigation increased the costs to the bankruptcy estate. In terms of costs and burdens, the Commission did not quantify the amount that Cantu's actions cost the estate, however, no such precise accounting is required under Rule 3.02.

In terms of false testimony and evidence, fraud, deceit, and misrepresentation, the jury heard that Cantu's bankruptcy filings omitted numerous assets and transactions, including the Mar-Rox water damage cases, two personal injury contingency fee cases, Cantu's personal injury lawsuit, the bronze horses, and the loan from Perez and Cantu's repayment to him. Cantu told the bankruptcy court that the *Moreno* case resulted in no fees in arbitration when it instead generated income for the bankruptcy estate. Cantu asserted variously that the bronze horses belonged to him or were gifts to his sister. Cantu told the bankruptcy court that he spent the IBC money on payroll, a light bill, and an expert witness, whereas the accounting analysis showed that Cantu spent the money on Perez, his bankruptcy attorney, an investigator, car loans, the home mortgage, and payroll. Schmidt testified that Cantu told him that Judge Crane granted the temporary restraining order, when Judge Crane had not done so, and Cantu acknowledged that he "might" have told Schmidt that Judge Crane granted it. Judge Schmidt's February 16, 2010 order states that Cantu "represented to the Court that he had an agreement with the buyer's attorney to remain in the premises," however, "the Trustee notified the Court . . . that the buyer did not agree to allow the Debtor to remain in the premises an additional 90 days and will not close the sale until the space is vacant."

Cantu asserts that the Commission failed to identify any specific false statements or that any alleged false statements were made to a tribunal. Based on the foregoing, we

disagree. The jury heard numerous specific instances of false statements. Further, the Texas Disciplinary Rules of Professional Conduct provide the following definition of a tribunal:

> "Tribunal" denotes any governmental body or official or any other person engaged in a process of resolving a particular dispute or controversy. Tribunal includes such institutions as courts and administrative agencies when engaging in adjudicatory or licensing activities as defined by applicable law or rules of practice or procedure, as well as judges, magistrates, special masters, referees, arbitrators, mediators, hearing officers and comparable persons empowered to resolve or to recommend a resolution of a particular matter; but it does not include jurors, prospective jurors, legislative bodies or their committees, members or staffs, nor does it include other governmental bodies when acting in a legislative or rule-making capacity.

TEX. DISCIPLINARY R. PROF'L CONDUCT, terminology. Cantu does not present argument or authority that Judge Schmidt, Judge Isgur, or Schmidt failed to meet this definition. Examining the plain language of this definition, we conclude that the false statements at issue were made to a tribunal.

In terms of whether Cantu had "knowingly disobeyed an obligation under the standing rules of or a ruling by a tribunal," and that conduct was an open refusal based either on an assertion that no valid obligation existed or on a willingness to accept any sanctions arising from such disobedience, the jury heard that Cantu failed to comply with multiple court orders. On September 30, 2009, the court ordered Cantu to turn over his nonexempt property, and he failed to do so. On October 19, 2009, Judge Isgur told Cantu that he had filed a frivolous lawsuit preventing the sale of his interest in Cor-Can and stating that "[f]urther frivolous conduct will not be tolerated." Nevertheless, Cantu subsequently filed a lis pendens and then sent letters threatening litigation over the sale. On November 20, 2009, Judge Schmidt ordered Cantu to 'cease and desist" from

71

engaging in conduct that unnecessarily multiplied the proceedings and unreasonably increased the estate's cost of administration and from unreasonably interfering with the trustee's administration of the bankruptcy estate. Nevertheless, Cantu again threatened litigation over the sale of the Atrium.

At trial, Cantu generally did not dispute the foregoing allegations but instead asserted that errors and omissions in the bankruptcy were caused by the malpractice of his bankruptcy attorney. The record indicates that she represented him for an indeterminate period from shortly after Cantu filed bankruptcy until immediately after the case was converted to Chapter 7 on June 24, 2009. To the extent that Cantu filed his original bankruptcy documentation under penalty of perjury on May 6, 2008, she was not yet representing him. While she did represent him when he filed amended documentation in the bankruptcy on July 18, 2008, Schmidt and Sather both agreed that debtors have continuing duties to ensure that their documentation is correct and accurate, and Cantu nevertheless failed to file corrected or amended documentation.

Cantu asserted that he made honest mistakes during the bankruptcy and that, rather than interfering with the bankruptcy administration, he was merely aggressively pursuing his legal rights. Cantu further defended the allegations against him by claiming bias on the part of Judge Isgur and Schmidt and charging that they committed ethical violations in handling his bankruptcy. Cantu also impugned Schmidt's motivations in serving as trustee and assailed the fees he charged.

Here, the jury heard testimony from Cantu, Schmidt, Judge Isgur, and expert witnesses Sather and Piatt. When evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general

72

proposition, the jury may believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness. *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018); *City of Keller*, 168 S.W.3d at 819. After reviewing this record in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support all the jury's findings. Furthermore, after considering and weighing all the evidence, the evidence is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust to be factually insufficient. We overrule Cantu's eighteenth issue.

## VII. INDIVIDUAL CAPACITY

In his nineteenth issue, Cantu asserts that he cannot lose his license to practice law for actions that he committed in his individual capacity rather than in his professional capacity as an attorney. He argues that the Commission complained of actions that Cantu took in his own bankruptcy proceedings, and that he should not be disbarred or otherwise disciplined for "such private conduct." In contrast, the Commission contends that the disciplinary rules apply to Cantu in his individual capacity.

In resolving issues regarding the construction of the Texas Rules of Disciplinary Procedure, we apply the rules of statutory construction. *In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008); *O'Quinn v. State Bar of Tex.*, 763 S.W.2d 397, 399 (Tex. 1988); *Comm'n for Lawyer Discipline v. Hanna*, 513 S.W.3d 175, 178 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *In re Seven–O Corp.*, 289 S.W.3d 384, 389 (Tex. App.—Waco 2009, orig. proceeding [mand. denied]); *see also In re Liebbe*, No. 12-19-00044-CV, 2019 WL 1416637, at *6 (Tex. App.—Tyler Mar. 29, 2019, orig. proceeding) (mem. op.). Thus, we review the trial court's construction of the rules de novo. *See Comm'n for Lawyer*

73

*Discipline v. Schaefer*, 364 S.W.3d 831, 835 (Tex. 2012) (per curiam); *In re Caballero*, 272 S.W.3d at 599; *O'Quinn*, 763 S.W.2d at 399; *Rodgers*, 151 S.W.3d at 614; *see also Washington v. Comm'n for Lawyer Discipline*, No. 03-15-00083-CV, 2017 WL 1046260, at *9 (Tex. App.—Austin Mar. 17, 2017, pet. denied) (mem. op.). Accordingly, whenever possible, we look to the plain meaning of the words used in the rules. *See Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 572 (Tex. 2016); *Rodgers*, 151 S.W.3d at 614. We also generally look to the entire rule, not to isolated portions, and when considering the interplay of more than one rule, we consider the rules within the broader scheme rather than individually. *See Janvey*, 487 S.W.3d at 572; *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008); *Rodgers*, 151 S.W.3d at 614. We determine what the Texas Supreme Court intended by enacting the rules, and, in the process, harmonize and give effect to the entire set of disciplinary rules. *Love v. State Bar of Tex.*, 982 S.W.2d 939, 942 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

The Texas Disciplinary Rules of Professional Conduct, by their terms, apply to actions taken by attorneys in both their personal and professional capacities. The Preamble states that a "lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs." TEX. DISCIPLINARY RULES PROF'L CONDUCT, preamble ¶ 4. Rule 8.04 enumerates actions which are prohibited by the rules and none of those actions require that the actions take place in the context of an attorney-client relationship. *Id.* R. 8.04(a)(1)–(12). Further, Rule 8.04(a)(1) expressly provides that a lawyer shall not violate the disciplinary rules "whether or not such violation occurred in the course of a client-lawyer relationship." *Id.* R. 8.04(a)(1).

The Texas courts that have addressed this issue agree that the rules apply to attorneys even when they are acting in their individual capacity. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 67–68 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 260 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Weiss v. Comm'n for Lawyer Discipline*, 981 S.W.2d 8, 20 (Tex. App.—San Antonio 1998, pet. denied); *Cohn v. Comm'n for Lawyer Discipline*, 979 S.W.2d 694, 697 (Tex. App.—Houston [14th Dist.] 1998, no pet.); *Diaz v. Comm'n for Lawyer Discipline*, 953 S.W.2d 435, 438 (Tex. App.—Austin 1997, no writ); *see also Diamond Consortium, Inc. v. Manookian*, No. 4:16CV94-ALM, 2017 WL 3301527, at *12 (E.D. Tex. Aug. 3, 2017) (op. & order); *Walter v. Comm'n for Lawyer Discipline*, No. 05-03-01779-CV, 2005 WL 1039970, at *1 (Tex. App.—Dallas May 5, 2005, pet. denied) (mem. op.).

We overrule Cantu's nineteenth issue.

## VIII. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Cantu's twentieth, twenty-first, and twenty-second issues assail the trial court's findings of fact and conclusions of law. In his twentieth issue, he asserts that the trial court failed to issue findings of fact which demonstrated "that it actually utilized its discretion." In his twenty-first issue, Cantu contends that the trial court must enter findings of fact which are sufficient to permit meaningful review of its decision. In his twenty-second issue, Cantu alleges that the trial court cannot "base a sanction on an opinion which it never read."

## A.     Background

The trial court signed Cantu's judgment of disbarment on April 11, 2016. Cantu filed a request for findings of fact and conclusions of law on April 12, 2016. On May 6, 2016, Cantu filed a notice of past due findings of fact and conclusions of law. The trial court entered its findings of fact and conclusions of law on June 9, 2016. The trial court's findings and conclusions span five pages and include fifteen findings of fact and five conclusions of law.

## B.     Applicable Law

Texas Rules of Civil Procedure 296, 297, and 298 govern the filing of findings of fact and conclusions of law. *See* TEX. R. CIV. P. 296, 297, 298; *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex. 1997). "In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law." TEX. R. CIV. P. 296. Rule 296 gives "a party a right to findings of fact and conclusions of law finally adjudicated after a conventional trial on the merits before the court." *IKB Indus. (Nigeria) Ltd.*, 938 S.W.2d at 442. In other cases, findings and conclusions are "proper, but a party is not entitled to them." *Id.*; *see Waterman Steamship Corp. v. Ruiz*, 355 S.W.3d 387, 428 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "The primary purpose for findings of fact is to assist the losing party in narrowing his issues on appeal by ascertaining the true basis for the trial court's decision." *Nicholas v. Envtl. Sys. (Int'l) Ltd.*, 499 S.W.3d 888, 894 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Rule 296 requires a party to file a request for findings of fact and conclusions of law within twenty days after the judgment is signed. TEX. R. CIV. P. 296. "The court shall

file its findings of fact and conclusions of law within twenty days after a timely request is filed." *Id.* R. 297. If the court fails to comply, the requesting party may file a notice of past due findings within thirty days of the original request. *Id.*; *see Sonnier v. Sonnier*, 331 S.W.3d 211, 214 (Tex. App.—Waco 2011, no pet.). If the trial court fails to file mandatory findings of fact and conclusions of law after a proper request, the failure is presumed harmful unless the record affirmatively shows the complaining party suffered no injury. *See Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex.1996) (per curiam); *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989). Error is harmful if it "probably prevented the appellant from properly presenting the case to the court of appeals." Tᴇx. R. Aᴘᴘ. P. 44.1(a)(2); *see Tenery*, 932 S.W.2d at 30; *Nicholas*, 499 S.W.3d at 894. Generally, the controlling issue is whether the circumstances of the case would require the appellant to guess at the reasons for the trial court's decision. *Brinson Benefits, Inc. v. Hooper*, 501 S.W.3d 637, 644 (Tex. App.—Dallas 2016, no pet.); *Elliott v. Kraft Foods N. Am., Inc.*, 118 S.W.3d 50, 54–55 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

## C.    Sufficiency of the Findings

In his twentieth and twenty-first issues, Cantu argues that the trial court's findings of fact and conclusions of law are too generic and conclusory to meet the foregoing requirements. Cantu asserts that the trial court's findings supporting its sanction against him "fail to explain how or why the trial court reached its decision." After his original request, Cantu did not request the trial court to make additional findings and conclusions. Rule 298 governs the request for additional findings and conclusions:

> After the court files original findings of fact and conclusions of law, any party may file with the clerk of the court a request for specified additional or amended findings or conclusions. The request for these findings shall be made within ten days after the filing of the original findings and conclusions

77

by the court. Each request made pursuant to this rule shall be served on each party to the suit in accordance with Rule 21a.

The court shall file any additional or amended findings and conclusions that are appropriate within ten days after such request is filed, and cause a copy to be mailed to each party to the suit. No findings or conclusions shall be deemed or presumed by any failure of the court to make any additional findings or conclusions.

TEX. R. CIV. P. 298. When a party fails to timely request additional findings and conclusions, it is deemed to have waived the right to complain on appeal of the court's failure to make them. *Howe v. Howe*, 551 S.W.3d 236, 244 (Tex. App.—El Paso 2018, no pet.); *Tabasso v. BearCom Grp., Inc.*, 407 S.W.3d 822, 829 (Tex. App.—Dallas 2013, no pet.); *Briargrove Park Prop. Owners, Inc. v. Riner*, 867 S.W.2d 58, 62 (Tex. App.—Texarkana 1993, writ denied); *Cities Servs. Co. v. Ellison*, 698 S.W.2d 387, 390 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *see also In re Estate of Miller*, 446 S.W.3d 445, 449 (Tex. App.—Tyler 2014, no pet.) ("The failure to [request additional findings] waives the party's right to complain on appeal about a presumed finding.").

Here, Cantu did not request that the trial court issue additional or amended findings and conclusions. Accordingly, Cantu's complaints regarding the sufficiency of the trial court's findings and conclusions are waived. *See* TEX. R. CIV. P. 298; *Howe*, 551 S.W.3d at 244; *Tabasso*, 407 S.W.3d at 829.

However, even if this alleged error were preserved, we would disagree with Cantu's evaluation of the sanction imposed. The trial court's findings and conclusions state that: in 1998, Cantu had been sanctioned by this Court and had been threatened with jail for continuing to impede or prevent collection of a final judgment rendered against him; in 2000, Cantu had been sanctioned, suspended, and ordered to pay attorney's fees for representing a party with material adverse interests; in 2001, Cantu had been

78

sanctioned, suspended, and ordered to pay attorney's fees for entering a prohibited transaction with a client; and had participated in fraudulent inducement of a jury as determined by our supreme court in 2014. The trial court also referred to the "numerous" instances of misconduct outlined by Judge Isgur in his memorandum opinion and on which the jury heard testimony and based its verdict. Finally, the trial court's findings include the fact finding that during this trial, the judge "admonished" Cantu on "several occasions for his conduct" including "going to the jury room to inquire about the venire panel, multiple attempts to delay the trial, and violating a court order to not contact his physician." *See* TEX. RULES DISCIPLINARY P. R. 3.10.A–L; *Kilpatrick*, 874 S.W.2d at 659; *Thawer*, 523 S.W.3d at 188; *Olsen*, 347 S.W.3d at 889. Based on the record and briefing, Cantu was able to properly present his case to this court of appeals, and Cantu did not need to guess at the reasons for the trial court's ruling. See TEX. R. APP. P. 44.1(a)(2); *Tenery*, 932 S.W.2d at 30; *Nicholas*, 499 S.W.3d at 894; *Brinson Benefits, Inc.*, 501 S.W.3d at 644; *Elliot*, 118 S.W.3d at 54–55.

We overrule Cantu's twentieth and twenty-first issues.

## D. *Ford v. Castillo* Finding

In his twenty-second issue, Cantu alleges that the trial court "cannot base a sanction on an opinion which it never read." Cantu's argument is based on the trial court's finding of fact number 8, which states:

> In 2015, the Texas Supreme Court upheld a trial court's order setting aside a settlement agreement and issuing a take nothing judgment in a product[] liability action when it was proven that Mark A. Cantu participated in fraudulent inducement of a jury. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 619 (Tex. 2014).

Cantu asserts that the finding of fact is inaccurate because in *Castillo*, the Texas Supreme Court reversed and remanded the case rather than rendering a take-nothing judgment as stated in the finding of fact. *See id.* Cantu argues that he was not a party to that case, he did not commit fraudulent inducement, and a "take nothing judgment has never been rendered in the underlying personal injury case." Cantu argues that the trial court's reference to the *Castillo* case shows that the trial court "never read the myriad [of] opinions concerning this controversy." (internal footnote omitted). *See Castillo v. Ford Motor Co.*, No. 13-10-00232-CV, 2015 WL 7023804, at *1 (Tex. App.—Corpus Christi–Edinburg Nov. 12, 2015, no pet.) (mem. op.); *Castillo v. Ford Motor Co.*, No. 13-10-00232-CV, 2013 WL 268986, at *1 (Tex. App.—Corpus Christi–Edinburg Jan. 24, 2013), *rev'd*, 444 S.W.3d 616 (Tex. 2014) (per curiam); *Ford Motor Co. v. Castillo*, 200 S.W.3d 217, 219 (Tex. App.—Corpus Christi–Edinburg 2006), *rev'd*, 279 S.W.3d 656 (Tex. 2009).

Assuming without deciding that Cantu's brief contains a clear and concise argument for the contentions made and noting that he fails to include appropriate citations to authorities, we reject Cantu's argument that this finding constituted harmful error. *See* TEX. R. APP. P. 38.1(i) (mandating requisites of an appellant's brief). Cantu did not draw the trial court's attention to this finding, however erroneous, by requesting that the trial court issue an amended finding. As previously stated, the failure of a party to request additional or amended findings or conclusions waives the party's right to complain on appeal about the presumed finding. *See* TEX. R. CIV. P. 298; *Howe*, 551 S.W.3d at 244; *Tabasso*, 407 S.W.3d at 829. *See Gentry*, 188 S.W.3d at 408.

We further note that in *Castillo*, the supreme court held that there was legally sufficient evidence to conclude that Cantu participated in jury fraud. *See Castillo*, 444

80

S.W.3d at 623. This Court ultimately affirmed a take-nothing judgment against Cantu's client and in favor of the defendant in that case. *Castillo v. Ford Motor Co.*, 13-10-00232-CV, 2015 WL 7023804, at *2 (Tex. App.—Corpus Christi–Edinburg Nov. 12, 2015, no pet.) (mem. op.).

We overrule Cantu's twenty-second issue.

## IX. ATTORNEY'S FEES

In his twenty-third, twenty-fourth, and twenty-fifth issues, Cantu attacks the trial court's award of attorney's fees. In his twenty-third issue, Cantu asserts that the Commission waived its right to attorney's fees because it failed to submit the issue to the jury. In his twenty-fourth issue, Cantu asserts that the Commission cannot eliminate his "constitutional right to a jury" by classifying an attorney's fees award as a sanction. And, in his twenty-fifth issue, he asserts that the trial court's award of appellate attorney's fees was supported by conclusory evidence. In sum, Cantu complains that the award of attorneys' fees in this case was improperly decided by the trial court and the evidence is insufficient to support the trial court's determination of attorney's fees on appeal. In contrast, the Commission asserts that the authority to award sanctions is vested in the trial court, not the jury, and that there is sufficient testimony to support the award of attorney's fees.

The trial court's judgment of disbarment awarded the Commission "reasonable and necessary attorney's fees and direct expenses" through the trial of this matter in the amount of $84,921.48. The judgment further awarded conditional attorney's fees on appeal to the court of appeals in the amount of $25,000 and an additional $10,000 for appeal to the Texas Supreme Court. The judgment stated that "any attorney fees and

costs ordered herein are penal in nature and part of the sanction for misconduct with results from regulation of [Cantu's] law license by the State Bar of Texas and the Supreme Court of Texas, through the Texas Disciplinary Rules of Professional Conduct."

## A.     Waiver

The Texas Rules of Disciplinary Procedure vest the determination of appropriate sanctions in a disciplinary proceeding with the trial court. *See* TEX. RULES DISCIPLINARY P. R. 3.09 ("If the court finds that the Respondent's conduct does constitute Professional Misconduct, the court shall determine the appropriate Sanction or Sanctions to be imposed."). The term "Sanction" may include restitution and the "Payment of Reasonable Attorneys' Fees and all direct expenses associated with the proceedings." *See id.* R. 1.06(FF). "The jury is not permitted to determine sanctions." *In re Caballero*, 441 S.W.3d 562, 570 (Tex. App.—El Paso 2014, orig. proceeding); *see also Washington*, 2017 WL 1046260, at *10 (concluding that the respondent was not entitled to have a jury determine the sanctions to be imposed in a disciplinary proceeding).

Given the plain language of the rules, we conclude that the rules assign the task of imposing sanctions to the trial court rather than a jury in disciplinary proceedings. *See* TEX. RULES DISCIPLINARY P. R. 3.09; *In re Caballero*, 441 S.W.3d at 570; *see also Washington*, 2017 WL 1046260, at *10. Accordingly, the Commission did not waive its request for attorney's fees by failing to submit the issue to the jury. We overrule Cantu's twenty-third issue.

**B.      Constitutional Right to Jury Trial**

In his twenty-fourth issue, Cantu asserts that the Commission cannot eliminate his "constitutional right to a jury" by classifying an attorney's fees award as a sanction. The Commission does not directly address this argument in its briefing.[12]

Our analysis here is governed by the Texas Rules of Disciplinary Procedure. We note that the constitutional right to a jury is satisfied so long as the disbarred attorney's conviction was obtained in a court of competent jurisdiction by constitutionally adequate procedures, and Cantu does not otherwise assail the award of attorney's fees. *See In re Humphreys*, 880 S.W.2d 402, 404–05 (Tex. 1994). "When construing statutes, we presume the Legislature intended them to comply with the Texas Constitution." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011) (orig. proceeding). And, we "should, if possible, interpret [a] statute in a manner that avoids constitutional infirmity." *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998).

We disagree with Cantu's argument. As stated previously, the disciplinary rules vest the authority to determine sanctions in the trial court, not the jury. *See* TEX. RULES DISCIPLINARY P. R. 3.09; *In re Caballero*, 441 S.W.3d at 570; *see also Washington*, 2017 WL 1046260, at *10. The Texas Supreme Court has held that a party complaining about an award of attorney's fees as a sanction does not have the right to a jury trial on the amount of the sanction. *Brantley v. Etter*, 677 S.W.2d 503, 504 (Tex. 1984) (per curiam) ("[W]e expressly hold that the amount of attorney's fees awarded as sanctions . . . is solely

---

[12] Based upon the reporter's record and the docket sheet, the parties presented an agreed order bifurcating the trial. The order does not appear in the record. At the pretrial hearing held on September 29, 2014, the Commission's counsel asserted that the rules allow bifurcation of "the jury proceeding in which [the jurors] find the facts that constitute misconduct" and "then the Court holds a separate hearing to determine what sanction to apply." Cantu's counsel asserted that he had "no objection" because the rules "set out that [the trial is] bifurcated." Cantu's counsel asked the court to sign the order. We question whether this issue has been preserved for our review; however, we address it in the interests of justice.

within the sound discretion of the trial judge, only to be set aside upon a showing of clear abuse of that discretion."); *see also Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707, 709 (Tex. 2019) (per curiam) (discussing *Brantley* as standing for the proposition that "a party complaining about an award of attorney's fees as a sanction does not have the right to a jury trial on the amount of the sanction").

Based on the foregoing, we conclude that Cantu did not have a constitutional right to have a jury determine his sanction in a disciplinary proceeding. *See Brantley*, 677 S.W.2d at 504. We overrule Cantu's twenty-fourth issue.

## C.    Appellate Attorney's Fees

In his twenty-fifth issue, Cantu asserts that the trial court's award of appellate attorney's fees was supported by conclusory evidence. The Commission instead contends that the testimony regarding appellate attorney's fees meets the standards established by courts in other cases.

Here, the Commission asked the trial court to take judicial notice of the following: the evidence that was presented in the first section of the trial, the jury's verdict, the court's file, and the various proceedings leading up to trial. The trial court agreed. At the sanction hearing, Homburg testified in support of the Commission's request for attorney's fees. After addressing his education, experience and overall qualifications, Homburg testified that he was familiar with the work that had been performed on the case and was also familiar with reasonable and customary attorney's fees charged by attorneys both state-wide and locally. He further provided additional and specific testimony in support of the attorney's fees award.

Regarding the Commission's request for appellate attorney's fees, Homburg testified as follows:

> I have handled appeals to the Court of Appeals. I have handled appeals to the Texas Supreme Court, as well as to the Board of Disciplinary Appeals handling disciplinary cases, and my opinion is that for handling a case such as this when it is appealed to the Court of Appeals, if it's successfully defended before the Court of Appeals, a reasonable and necessary amount of attorneys' fees and expenses would be $25,000.
>
> That's based upon not only the time that would be involved and the skill that would be involved and the novelty of some of the issues that were presented, but also the—the expenses involved in preparation of a transcript and—and other things that would be requisite to a—defending this verdict before the Court of Appeals.
>
> In the event of an application for writ that needed [to] be defended before the Texas Supreme Court, my opinion is that it would—$10,000 would be a reasonable and necessary amount for defending a case before the Supreme Court.
>
> It's less before the Supreme Court because the transcript has already been prepared, the issues are—should be substantially narrowed by the time it gets to the Texas Supreme Court, and—and so it would cost less. It would be less of a reasonable fee to—to defend it before the Supreme Court than it would be before the Court of Appeals.
>
> Those figures that I have given, in my opinion, are reasonable. Those figures are necessary to handling of the lawsuit.

On cross-examination, Cantu's counsel questioned Homburg about travel-related issues regarding some hearings in the case that were held in Bexar County rather than Hidalgo County but did not otherwise address the award of attorney's fees or the award of appellate attorney's fees.

Generally, the party seeking to recover attorney's fees carries the burden of proof. *Smith v. Patrick W.Y. Tam Tr.*, 296 S.W.3d 545, 547 (Tex. 2009); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). "General, conclusory testimony devoid of any real substance will not support a fee award." *Rohrmoos Venture v. UTSW DVA*

*Healthcare, LLP*, 578 S.W.3d 469, 501–02 (Tex. 2019). Thus, a claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought. *See id.*; *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam); *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763–64 (Tex. 2012). Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *Rohrmoos Venture, LLP*, 578 S.W.3d at 502; *El Apple I, Ltd.*, 370 S.W.3d at 762–63. An award of attorney's fees may be supported by the attorney's own testimony:

> An attorney's testimony about the reasonableness of his or her own fees is not like other expert witness testimony. Although rooted in the attorney's experience and expertise, it also consists of the attorney's personal knowledge about the underlying work and its particular value to the client. The testimony is similar to that of a property owner whose personal knowledge qualifies him to give an opinion about his own property's value. *See*, *e.g.*, *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 874 (Tex. 2009); *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). The attorney's testimony is not objectionable as merely conclusory because the opposing party, or that party's attorney, likewise has some knowledge of the time and effort involved and if the matter is truly in dispute, may effectively question the attorney regarding the reasonableness of his fee.

*Garcia v. Gomez*, 319 S.W.3d 638, 641 (Tex. 2010); *see also Nat'l Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 n.7 (Tex. 2012).

We generally review a trial court's award of appellate attorney's fees for an abuse of discretion. *Messier v. Messier*, 458 S.W.3d 155, 169 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Law Offices of Windle Turley, P.C. v. French*, 164 S.W.3d 487, 493 (Tex. App.—Dallas 2005, no pet.). To be proper, there must be evidence of the fees'

reasonableness pertaining to appellate work. *Messier*, 458 S.W.3d at 169; *State and Cty. Mut. Fire Ins. Co. ex rel. S. United Gen. Agency of Tex. v. Walker*, 228 S.W.3d 404, 410 (Tex. App.—Fort Worth 2007, no pet.); *Keith v. Keith*, 221 S.W.3d 156, 169 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Cantu does not attack Homburg's qualifications or lack of experience to testify regarding reasonable appellate attorney's fees but instead only asserts that Homburg's testimony is unacceptably conclusory. Homburg testified that he had previously handled appeals at the court of appeals, supreme court, and to the Board of Disciplinary Appeals. He based his opinion regarding appellate fees on the time that would be involved, the skill that would be involved, the novelty of some of the issues that were presented, and the expenses involved in handling an appeal. He testified that the appellate fees for review to the supreme court would be lower because the records would already have been prepared and the issues would be "substantially narrowed" at that level of review. He testified that the fees were reasonable and necessary.

While Homburg's testimony regarding appellate fees could have been more extensive, we cannot say that his testimony was insufficient. Cantu's counsel was familiar with the case, had some knowledge of the time and effort involved, and could have cross-examined Homburg about the reasonableness of the Commission's request for attorney's fees, but did not cross-examine Homburg regarding the appellate attorney's fees or present any additional or controverting evidence. *See Garcia*, 319 S.W.3d at 641; *Jackson Walker, LLP v. Kinsel*, 518 S.W.3d 1, 26 (Tex. App.—Amarillo 2015), *aff'd sub nom. Kinsel v. Lindsey*, 526 S.W.3d 411 (Tex. 2017); *In re Moore*, 511 S.W.3d 278, 289 (Tex. App.—Dallas 2016, orig. proceeding); *State Office of Risk Mgmt. v. Olivas*, 509

S.W.3d 499, 510 (Tex. App.—El Paso 2016, no pet.); *State & County Mut. Fire Ins. Co. ex rel. S. United Gen. Agency of Tex. v. Walker*, 228 S.W.3d 404, 409–10 (Tex. App.—Fort Worth 2007, no pet.). We conclude that the Commission's evidence is legally and factually sufficient to support the trial court's award of $25,000 and $10,000 in contingent appellate attorney's fees. We overrule Cantu's twenty-fifth issue.

## X. CUMULATIVE ERROR

By his twenty-sixth and final issue, Cantu asserts that he is entitled to a new trial due to cumulative error. Cantu asserts that the errors allegedly committed in this case, including the admission of testimony from Judge Isgur and Schmidt and the conditional submission in the charge constitute cumulative error which entitles him to a remand or reversal.

Under the cumulative error doctrine, when several errors exist but are not considered reversible, all errors considered together could present harmful error requiring reversal. *Lakeside Vill. Homeowners Ass'n, Inc. v. Belanger*, 545 S.W.3d 15, 46–47 (Tex. App.—El Paso 2017, pet. denied); *In re E.R.C.*, 496 S.W.3d 270, 281 (Tex. App.—Texarkana 2016, pet. denied); *Brown v. Hopkins*, 921 S.W.2d 306, 319 (Tex. App.—Corpus Christi–Edinburg 1996, no pet.); *Klein v. Sporting Goods, Inc.*, 772 S.W.2d 173, 179 (Tex. App.—Houston [14th Dist.] 1989, writ denied). To determine if a cumulation of errors denied the appellant its right to a fair trial and due process of law, we consider all errors in the case and the record as a whole to determine if the errors collectively were calculated to cause and probably did cause the rendition of an improper judgment. *Lakeside Vill. Homeowners Ass'n, Inc.*, 545 S.W.3d at 46–47; *Brown*, 921 S.W.2d at 319; see TEX. R. APP. P. 44.1(a). When there are no errors, we reject cumulative error

arguments. *In re BCH Dev., LLC*, 525 S.W.3d 920, 930 (Tex. App.—Dallas 2017, orig. proceeding); *In re E.R.C.*, 496 S.W.3d at 281.

After reviewing the entire record, we conclude that the trial court did not commit error. Accordingly, we find no cumulative error. *See In re BCH Dev., LLC*, 525 S.W.3d at 930; *In re E.R.C.*, 496 S.W.3d at 281. We overrule Cantu's twenty-sixth issue.

## XI. CONCLUSION

We affirm the judgment of the trial court.


GINA M. BENAVIDES
Justice

Delivered and filed on the
3rd day of December, 2020.

89